Unites States District Court
Eastern District of California

**FILED**

OCT 27 2021

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

| | |
|---|---|
| United States of America, ] | |
| Plaintiff, ] | |
| ] | Case No. 2:12-cr-00241-WBS |
| v. ] | |
| ] | Answer to the Government |
| Raymell Eason, ] | Supplemental Brief |
| Defendant. ] | |

        Comes now, defendant, Raymell Eason, ProSe, in answer
to the Government's supplemental brief, and in support of his
motion for sentence modification and Compassionate Release authorized
under 3582 (c)(2) and 3582 (c)(1)(A) respectfully.


        The government contends that the BOP, and Lompoc are taking
precautionary measures and doing what is needed to keep the
defendant healthy and safe in a controlled environment, while
at the same time trying to keep COVID out of the institution.
However, that is a far cry from the truth. It is known and documented
that the BOP, and Lompoc specifically, does not always tell
the whole truth when it comes to paperwork and the medical treatment
of inmates. They continue to depart from the truth by portraying
to this court that they can provide adequate medical care, and
no doubt they will maintain this falsehood as long the ACLU
lawsuit is active. (What else do we expect them to say? That
they can not do it?) On numerous occasions Lompoc and the BOP
have been caught lying, and it is no different now. The government
claims that Lompoc has COVID under control, and that only one
staff member has it. What they did not say, is that the one
staff member infected half a unit justthree weeks ago, or how
they mistakenly placed an inmate infected with COVID into a
cell with another inmate, Ruchell Gilbert, who was waiting in
quarantine to go home. Are these precautionary measures touted
by the government? In United v. Richardson, No.2:17-cr-00048-JAM,
the courtnoted that on a number of occasions the BOP incorrectly
represents the status of inmates. see to United States v. Levario,
No.12-cr-00039-JAM. Also see Dr. Homer Venters Covid-19 Inspection
of Lompoc, attached as (Exhibit B) as well as the Office of

the Inspector General Report, attached as(Exhibit A ).

AS the government correctly states the defendant is fully vaccinated. Mr. Eason has done everything within his power to prevent further illness, yet he has taken it only to find out later that efficacy is greatly effected and does not fully work on people who severely, or morbidly obese, such as the defendant. CDC guidance warns that the research shows the vaccine is not effective on people obesity. see CDC website at https://www.cdc.gov/ obesity/data/obesity-and-covid-19.html, and Sarah Varney, America'sobesity Epidemic Threatens Effectiveness of any Covid Vaccine, Kaiser Health News(Aug.6, 2020), https:khn.org/news/americas-obesity-epidemic- threatens-effectiveness-of-any-covid-vaccine.

There is also a chance that the vaccine will not work against the various strains of the virus. see United States v. Bozon pappa,(2021 U.S Dist. Lexis 75976 at 8.) Even studies published in the New England Journal of Medicine support arguements that even fully vaccinated people are not nearly as COVID bullet-proof as early CDC prognostications made them out to be.2021 U.S. Dist. Lexis 75976 at 8. Even studies published in the New England Journal of Medicine support arguments that even fully vaccinated people are not nearly as COVID bullet proof as early prognostications made them out to be.(CNN studies confirm warning immunity fron Pfizer's COVID-19 Vaccine, Oct. 7th)

1B1.13 Aruda

Neither the [U.S. Sentencing Commission's Compassionate Release] policy statement nor the commentary to it binds a district court addressing a prisoner's own motion under 3582 "United States v. Shkambi, 993 F.3d 388,393,(5th Cir.2021). Although "not dispositive," the commentary to U.S.S.G. 1B1.13 nonetheless "informs [The Court] analysis as to what reason may be suffecently 'extraordinary and Compelling' to merit compassionate release." United States v. Thompson, 984,F.3d 43(5th Cir.2021)(Citing United States v. Rivas Fed. Appy. 556,2020 WL 6437288, at 2*(5th Cir.2020). The First Step Act's amendment of 3582(c)(1)(A), and new Policy Statement has not been issued since the amendment. Accordingly, [A]s of now, there is no Sentencing Commission policy statement' applicable' to defendant's compassionate -release motion, which means that district courts need not conform, under 3582(c)(1)(A)'s

consistency requirements , to 1B1.13 in determining whether
therer exist "extraordinary and compelling reasons' for a sentence
reduction". United States v. McCoy,981 F.3d271,283(4th Cir.2020).
Therefore , the district courts are "empowered... to consider
any extraordinary and compelling reason for release that a defendant
might raise."(quoting United States v. Zwlo,976F.3d228,230(
2020). The McCoy court then agreed with a growing number of
district courts that severity of, and disparity of sentence
can be a factor supporting a reduction of sentence under 3582(c)(1)(A)
in an appropriate case. In McCoy, 981 F.3d at 285-86("We may
legitimately consider under the "extraordinary and compelling
reasons" inquiry, that defendants are serving sentences that
Congress itself views as dramatically longer than necessary
or fair").

U.S.S.G. 1B1.13 defines"Extraordinary and Compelling Reasons"
in part as follows(emphasis added):

1. Extraordinary and Compelling Reasons- Provided the defendant
meets the requirements of subdivision(2), extraordinary and
compelling reason exist under any of the circumstances set forth
below:

2.

(A) Medical Condition of the defendant.

(i) The defendant is suffering from a illness(i.e., a serious
and advanced illness with an end of life trajectory).
A specific prognosis of life expectantcy(i.e., a probability
of death within a specific time period) is not required. Examples
include metastatic solid-tumor cancer, Amyotrophic lateral selerosis(ALS),
end-stage organ disease, and advanced dementia.

(ii) The defendant is-

(1) suffering from a serious physical or medical condition,

(1) suffering from a serious functional or cognitive impairment,
or,

(11) experiencing deteriorating physical or mental health because
of aging process, the substantially diminishes the ability of
the defendant to provide self-care within the environment of
a correctional facility and from which he or she is not expected
to recover.

The court must consider the 3553(A) Factors, and whether the sentencing court should consider said factors that may be imposed when deciding a reduction of sentence under section 404 of the First Step Act. see Houston v. United States, (No.21-297) Supreme Court.

<u>Extraordinary and Compelling Reasons Exist Here</u> Mr. Eason's circumstances amid the repeated outbreak of COVID-19alone with his underlying medical conditions, place him at higher risk should he recontract the disease. These are "Extraordinary and Compelling 'Reasons" to reduce his sentence. Blacks Law Dictionary defines "Extraordinary" as "[beyond]what is usual, customary, regular, or common,"(11th ed.2019). It defines "compelling need" as a need so great that irreparable harm or injustice would result if it is not met," (11th ed.2019). see also United States v. Rodriguez, 451F.Supp.3d.392 at 400; Dist. Lexis 58718.

The threat of recontracting COVID-19 at USP Lompoc, in combination with Mr. Eason's race and underlying health conditions(pre-diabetes, hypertensinon, stage 2 kidney disease, obesity, and asthma) puts him at an increased risk of severe covid related complications, thus Extraordinary and Compelling reasons do exist to reduce his sentence. (see defendant's medical records)

The government argues that Mr. Eason is not at a significant risk of contracting COVID at USP Lompoc, and further disputes that Mr. EAson underlying conditions place him at a heightened risk for COVID related complications.

To determine this the court must first assess the defendants heightened risk of contracting COVID at USP Lompoc before considering whether his risk of severe Covid-19 complications provide extraordinary and compelling reasons for release.

**<u>There is a heightened Risk of Recontracting COVID Again While in Custody</u>.**

Mr. Eason believes that he has met his burden showing he faces a heightened risk of recontracting COVID again while in custody at USP Lompoc. The government cites current COVID case numbers only as one staff members. However, just as it takes only one match to start a fire, it takes only one case for Covid to flare out of control in a institutional setting.

Lompoc staff have dropped the ball on numerous occasions and have spread COVID-19 by not following the rules set by the CDC. A Inspector General Report indicates that BOP's Lompoc facilities have been among the least effective correctional institutions at containing COVID-19. **see Department of Justice, office of the Inspector General, Pandemic Response Report 20-086 July 2020, Remote Inspection of Federal Correctional Complex Lompoc, at ii(Summary of Inspection Results) attached as Exhibit A)** The report shows that Lompoc struggles with inadequate medical staff, covid screening and testing, delays in implementing precautionary restrictions and isolation procedures for infected inmates. There is also scant personal protective equipment (PPE) and also to little space to properly quarantine those infected. Mr. Eason can further attest, that inmates at USP Lompoc still do not have the proper PPE's. They are not tested unless they have a fever and there is no social distancing because it is not possible in the facility. In light of the forgoing, the court should find that Mr. Eason has demonstrated that remaining at USP Lompoc puts him at a heightened risk of contracting COVID, compared to any risk he would face in his proposed residence.

**Mr. Eason is at a Heightened Risk of Severe Complications from COVID-19.** Besides the plethora of Mr. Eason's underlying conditions that medical evidence indicates can increase the risk of COVID related conditions, the court should consider the defendants race. Race and Ethnicity are risk makers for other underlying conditions that affect health. Black and Hispanics are the most affected by COVID-19, especially those who have underlying condition. (see,http://covid.cdc.gov/covid-data-tractor/#demographics). Although the government concedes that Mr. Eason has a multitude of underlying conditions which the CDC indicates can increase the risk of COVID related complications, they claim that these conditions are being relatively controlled. However, the government provides no indicia that treated underlying conditions are any less susceptible in creating Covid related complications than those that are untreated. In fact Mr. Eason's most recently reported Body Mass Index(BMI) puts him in the range of morbidly obese, this increases the risk of complications from COVID-19. see, CDC "Coronavirus Disease 2019(COVID-19):

:people with certain medical conditions,"http://www.cdc.gov/
coronavirus/2019-meov/need-extra-precautions/people-with-medical-
condition.html(Last visit Sept.9th,2021). Therefore, Mr. Eason's
weight and race in combination with his multitude of underlying
medical conditions, increase his risk for COVID related complications,
thus providing extraordinary and compelling reason for release.
Eason does not pose a danger to the safety of the community. First,
Eason wishes to clarify that through his good behavior and work
ethics he has earned 486 days off his full term served, putting him
well(over) 50% time-served or 9 years 5 months and 26 days, making
it 59.6% already served. Second, even with the factors that support
Mr. Eason's motion for Compassionate Release under 3582(c)(1)(A) and
3582(A)(2)(d), he understands that there may be some hesitation on
the courts part when considering whether the defendant is a danger to
the community under 3142(g).

This one act surrounding Mr.Eason's current offense does not define
who he is. If the court looks at Mr. Eason's criminal record it will
see that there is absolutely no prior violence in his past, just
minor drug offense. The government claiming someone is a threat to
the community is a tool they use when they don't want the courts
to let someone out of jail. A threat to the community or others
is someone whose record is peppered with violence(1.e. murder,
attempted murder, assault, battery, domestic violence and other
crimes that have a victim), or has a gang, Mr. Eason does not fit
into this category. He acknowledges the seriousness of this office
and detests the thought of ever repeating his poor decision making
of the past. The government contention that an inmates behavior
in prison does not correlate to doing well in society is absurd,
why then is there an emphasis on rehabilitation? Even though a leopard
cannot change his spots, a man can certainly change his ways. Also,
Mr.Eason plans to live with a friend in North Sacramento-in the
Notomas area untilhe can save up enough to get his own place or
work things out with his wife. Until then his family including his
wife will be supporting him and is going to pay his dues at local
324 so that he can start working immediately, through his family
and friend he will be given the tools he needs to help him succeed
in the real world.
Vaccine and staff

With only 46% of the staff and inmates together it is far less than anyone thought it would be, and now with President Biden's new mandate, already understaffed. Due to this mandate staff are quitting, retirring, or going somewhere else. Today on CNN News they announced that General Colin Powell an African American died from COVID-19 complications and he was fully vaccinated. Meaning, the vaccine is not as effective as its made out to be . This is just the first case that's being reported.

Conclusion

Mr. Eason has met his burden showing that he faces a heightened risk of recontracting Covid while in custody at Lompoc. In combination with his race and underlying medical conditions he prays this court will find extraordinary and compelling reasons for a reduction in sentence/compassionate release.

Date  10 - 20 - 21                    Respectfully Submitted,

                                      x Taymull Eason

EXHIBIT A
INSPECTOR GENERAL REPORT



**DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL**

# PANDEMIC RESPONSE REPORT
# 20-086

**JULY 2020**

---

# Remote Inspection of Federal Correctional Complex Lompoc

**EVALUATION AND INSPECTIONS DIVISION**

# INTRODUCTION



### OIG COVID-19 Inspection Efforts

In response to the coronavirus disease 2019 (COVID-19) pandemic, the U.S. Department of Justice (Department, DOJ) Office of the Inspector General (OIG) initiated a series of remote inspections of Federal Bureau of Prisons (BOP) facilities, including BOP-managed institutions, contract institutions, and Residential Reentry Centers (RRC). In total, these facilities house approximately 160,000 federal inmates. The OIG inspections sought to determine whether these institutions were complying with guidance related to the pandemic, including Centers for Disease Control and Prevention (CDC) guidelines, DOJ policy and guidance, and BOP policy. While the OIG was unable to meet with staff or inmates as part of these remote inspections, the OIG issued a survey to over 38,000 BOP employees, as well as staff of contract institutions and RRCs.

DOJ COVID-19 Complaint

Whistleblower Rights and Protections

The CDC has noted that the confined nature of correctional facilities, combined with their congregate environments, "heighten[s] the potential for COVID-19 to spread once introduced" into a facility. According to BOP data, as of July 14, 2020, 8,642 inmates and 887 staff in BOP-managed institutions and community-based facilities have tested positive for COVID-19.[1] However, testing within most BOP facilities has been limited. In those institutions where widespread inmate testing has been undertaken, including at one of the four facilities at the Federal Correctional Complex (FCC) Lompoc in Santa Barbara County, California, the percentage of inmates testing positive has been substantial. For example, at the one FCC Lompoc facility where all inmates were tested, the number of inmates testing positive for COVID-19 exceeded 75 percent as of May 11. Separately, as of early May, at least 53 of the 416 staff members at FCC Lompoc had been tested and approximately 60 percent (32 of 53) of those individuals tested positive.

Between April 23 and May 1, 2020, the OIG conducted a remote inspection of FCC Lompoc to understand how the COVID-19 pandemic affected the complex and to assess the steps Lompoc officials took to prepare for, prevent, and manage COVID-19 transmission within its facilities (see Appendix 1 for the scope and methodology of the inspection). As part of that effort, we considered whether Lompoc's policies and practices complied with BOP directives implementing CDC guidance, as well as DOJ policy and guidance. We conducted the inspection through telephone interviews with FCC Lompoc and BOP officials, review of documents, assessment of inmate demographic data and staff and inmate COVID-19 case data by the OIG's Office of Data Analytics (ODA), analysis of FCC Lompoc-specific results from a BOP-wide employee survey regarding COVID-19 issues that the OIG conducted in late April, and consideration

---

[1] This estimate does not include inmates who have tested positive, recovered, and have since been released by the BOP.

of complaints to the OIG Hotline and by an FCC Lompoc union official (see Appendix 2 for a summary of survey results from FCC Lompoc).

## Summary of Inspection Results

The findings of the OIG's remote inspection of FCC Lompoc are as follows:

- A preexisting shortage of medical staff at Lompoc was among the biggest challenges in mitigating COVID-19 transmission because of the burdens of screening inmates and staff members for COVID-19 symptoms while still providing routine medical care to the institution's approximately 2,700 inmates.

- An insufficient number of correctional staff members resulted in Lompoc officials delaying full implementation of staff movement restrictions until 15 days after the BOP directed institutions with COVID-19 cases to further modify operations to maximize social distancing in facilities to help control the spread of infection.

- Lompoc's initial COVID-19 screening process was not fully effective. We identified two staff members who came to work in late March after experiencing COVID-19 symptoms and whose symptoms were not detected in the screening process to preclude them from working.

- Lompoc staff did not seek to test or isolate an inmate who reported on March 22 that he began having COVID-19 like symptoms 2 days earlier and who was examined on 4 separate days between March 22 and 26. The local hospital tested the inmate for COVID-19 on March 27, and his results came back positive on March 30.

- The lack of a permanent leadership team and the physical characteristics of Lompoc facilities contributed to deficiencies in Lompoc's response to COVID-19.

- The OIG's BOP-wide survey in late April 2020 reflected that Lompoc staff identified as immediate needs at that time more personal protective equipment for staff and hygiene supplies for inmates, additional staff to cover posts, and more space to quarantine inmates.

- The BOP's use of home confinement in response to the spread of COVID-19 at FCC Lompoc in April, as a mechanism to reduce either the at-risk inmate population or the overall prison population in order to assist with social distancing, was extremely limited. As of May 13, over 900 Lompoc inmates had contracted COVID-19 and we determined that only 8 inmates had been transferred to home confinement in accordance with BOP guidance.

We describe these findings in greater detail, and other observations we made during our inspection, in the Inspection Results section of this report.

## COVID-19 at FCC Lompoc

At the time of our inspection, FCC Lompoc housed approximately 2,700 medium, low, and minimum security male inmates in four separate facilities in Lompoc, California: a U.S. Penitentiary (USP), a Federal Correctional Institution (FCI), and two camps. As a Care Level 2 complex, FCC Lompoc's population includes inmates with chronic care needs.[2] The institution had more than 400 BOP correctional staff who provided daily correctional services to inmates.

FCC Lompoc learned of its first positive COVID-19 test result of a staff member on March 27 and of its positive test of an inmate on March 30. The inmate had preexisting health issues and had been hospitalized since March 26. On May 4, FCC Lompoc expanded inmate COVID-19 testing to include testing all of the FCI's 1,162 inmates. By May 11, the BOP reported that FCC Lompoc had 25 staff and 912 inmates with active COVID-19 and that 2 inmates had died from COVID-19.[3] Below, we provide a snapshot of FCC Lompoc's COVID-19 outbreak as of July 13.

Inmate Population[a]

Active Inmate COVID-19 Cases Over Time, March 31–July 13, 2020[b]

  2,587

Active Inmate Cases[b]

 8

Inmate Deaths[c]

4



[a] As of June 14, 2020. Population totals may differ from BOP statistics due to categories of inmates (e.g., juveniles) excluded from the data received by the OIG.

[b] As of July 13, 2020. The BOP defines "active cases" as open and confirmed cases of COVID-19. Once someone has recovered or died, he or she is no longer considered an active case.

[c] As of July 13, 2020. Deaths due to COVID-19.

**Data Source:** BOP

---

[2] BOP officials assign each inmate a care level based on the inmate's individual medical needs. Care levels range from Care Level 1 for the healthiest inmates to Care Level 4 for inmates with the most serious medical conditions. The BOP also assigns each institution a care level from 1 to 4, based on the institution's level of medical staffing and resources. The goal of the care level system is to match inmate medical needs with institutions that can meet those needs. A Care Level 2 institution is capable of treating inmates with conditions requiring clinical contact every 3 months.

[3] The BOP defines "active cases" as open and confirmed cases of COVID-19. Once someone has recovered or died, he or she is no longer considered an active case.

DOJ Federal Staff[a]

 416

Active Staff Cases[b]

 2

Staff Deaths[c]

 0

Active Staff COVID-19 Cases Over Time, March 31–July 13, 2020[b]



[a] As of June 25, 2020.

[b] As of July 13, 2020. Active cases are open and confirmed cases of COVID-19. Once someone has recovered or died, he or she is no longer considered an active case.

[c] As of July 13, 2020. Deaths due to COVID-19.

**Data Sources:** BOP, National Finance Center

Total Confirmed Santa Barbara County COVID-19 Cases Over Time, March 31–July 13, 2020[a]



[a] As of July 13, 2020. Total confirmed cases are cumulative positive COVID-19 cases.

**Data Source:** Johns Hopkins University Center for Systems Science and Engineering

# TABLE OF CONTENTS

INSPECTION RESULTS..............................................................................................................1

    Preexisting Staffing Shortages............................................................................................1

    COVID-19 Staff Screening Procedures ....................................................................................3

    COVID-19 Testing.................................................................................................................5

    Personal Protective Equipment and Cloth Face Coverings.......................................................7

    Lack of Permanent Leadership and Communications Protocols ..............................................9

    Conditions of Confinement, Visitation, Commissary, and Hygiene Products ........................ 10

    Quarantine Procedures.....................................................................................................12

    Use of Home Confinement and Compassionate Release Authorities ................................... 13

APPENDIX 1: SCOPE AND METHODOLOGY OF THE INSPECTION........................................ 24

APPENDIX 2: OIG COVID-19 SURVEY RESULTS FOR FCC LOMPOC ..................................... 25

APPENDIX 3: TIMELINE OF BOP GUIDANCE....................................................................... 29

# INSPECTION RESULTS

## Preexisting Staffing Shortages

Lompoc's Health Services Administrator told the OIG that prior to the COVID-19 outbreak the institution's medical staffing was at only 62 percent.[4] We found that this preexisting shortage of medical staff may have negatively impacted FCC Lompoc's ability to conduct screenings of inmates and staff members for COVID-19 symptoms, a time-consuming process that had to be performed on a regular schedule while also providing routine medical care to the institution's approximately 2,700 inmates. Lompoc's Clinical Director stated that medical staffing has been the biggest challenge in addressing the institution's treatment demands and that COVID-19 exacerbated Lompoc's existing medical staff shortage, particularly in light of two paramedics and a physician who were on sick leave for significant periods of time.[5] As of April 30, the BOP had designated 9 temporary duty (TDY) medical staff to FCC Lompoc and had increased the institution's medical staffing by approximately 38 percent (from about 24 to 33).[6]

In addition to the shortage of medical staff, we found that a significant shortage in correctional staff affected FCC Lompoc's response to the COVID-19 outbreak, including its ability to promptly implement staff movement restrictions, a measure that was designed to control potential COVID-19 transmission. Based on information we learned from Lompoc officials and BOP policy, described below, about the importance of limiting staff movement and the effect of staff shortages in doing so, we believe that Lompoc staff shortages through early April may have increased the risk of COVID-19 transmission because the complex did not always have enough staff to allow Correctional Officers to remain in one facility.

---

[4] In response to the working draft of this report, the BOP stated that maintaining adequate levels of medical staff in BOP institutions was an ongoing nationwide challenge. The OIG's 2016 BOP medical staffing challenges report detailed the serious medical staffing issues facing the federal prison system, and the OIG included this staffing challenge in our recent annual Top Management and Performance Challenges report. See DOJ OIG, *The Federal Bureau of Prisons' Medical Staffing Challenges*, Evaluation and Inspections Division (E&I) Report 16-02 (March 2016), www.oversight.gov/sites/default/files/oig-reports/e1602.pdf, and DOJ OIG, *Top Management and Performance Challenges Facing the Department of Justice-2019* (October 2019), www.justice.gov/sites/default/files/reports/2019.pdf.

[5] On May 16, on behalf of Lompoc inmates, the American Civil Liberties Union filed a class action lawsuit in the U.S. District Court for the Central District of California alleging that the BOP "failed to conduct timely testing, provide adequate [personal protective equipment], or effectively isolate those who are infected and those who have had contact with the infected." Among other claims, the lawsuit alleged that when an inmate with asthma reported symptoms consistent with COVID-19 he was ignored for days and denied medical treatment until he went into respiratory shock and had to be put on a ventilator. The lawsuit also stated that, "due to the burden on Lompoc's medical resources from COVID-19-related care," another inmate was unable to get needed cancer treatment. See Yonnedil Carror Torres, Vincent Reed, Felix Samuel Garcia, Andre Brown, Shawn L. Fears v. Louis Milusnic, in His Capacity as Warden of Lompoc, and Michael Carvajal, in His Capacity as Director of the BOP, Case 2:20-cv-04450-CBM-PVC, May 16, 2020.

[6] As of July 13, the Western Regional Office, which is an administrative office providing oversight and support to facilities located in the Western Region including FCC Lompoc, stated that it had approved 18 health services staff from other BOP institutions to support Lompoc's medical services.

On March 13, the BOP directed Wardens to immediately "implement modified operations to maximize social distancing in [BOP] facilities," to the extent practicable.[7] The BOP supplemented this guidance on March 31, which included an instruction to institutions with COVID-19 cases to limit staff "movement to the areas to which they were assigned, such as departments/posts, whenever feasible to help control the spread of infection."[8] The same day, the BOP Western Regional Office directed Lompoc to implement these measures and to "develop a plan to minimize, and if possible, eliminate staff movement between the USP, FCI and Camp." However, it was not until April 14 that the acting Complex Warden sent a memorandum to all FCC staff members stating that "compartmentalization of staff to limit working at different facilities...will begin no later than April 15," which was 15 days after the BOP had directed institutions to take such steps and more than 2 weeks after Lompoc had identified its first COVID-19 cases.[9] Lompoc officials told us that they could not fully implement the compartmentalization of staff until the arrival of adequate TDY staff because the institution did not have enough staff to fill all mandatory correctional posts, both at FCC Lompoc and at the local hospitals where some Lompoc inmates were receiving care.[10]

In response to these staffing shortages, on March 31 the BOP began deploying TDY staff from other BOP institutions to FCC Lompoc to assist with inmate security, clinical care, administrative oversight, and facility modifications for a mobile hospital (see the text box below). As of April 30, the BOP had deployed 99 TDY correctional staff, increasing FCC Lompoc's nonmedical staffing complement by approximately 25 percent (from about 390 to 490). These additional staff members, upon their arrival, assisted Lompoc in managing its COVID-19 outbreak and allowed it to implement the BOP's guidance limiting staff movement. However, unless the BOP promptly

---

[7] See BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Two Action Plan, March 13, 2020, 3.

Social distancing, also called "physical distancing," means keeping at least 6 feet between yourself and other people and not gathering in groups. In a correctional setting, the CDC recommends implementing a host of social distancing strategies to increase the physical space between incarcerated people (ideally 6 feet between all individuals, regardless of the presence of symptoms), noting that not all strategies will be feasible in all facilities and strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. See CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," March 23, 2020, www.cdc.gov/ coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (accessed July 15, 2020).

[8] See BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Five Action Plan, March 31, 2020, 2.

[9] In comparison, for example, FCC Tucson in Tucson, Arizona, an institution in the same BOP region as FCC Lompoc but without staffing concerns or a COVID-19 outbreak in April, fully implemented its staff movement restrictions on April 5. See DOJ OIG, *Remote Inspection of Federal Correctional Complex Tucson*, E&I Report 20-087 (July 2020).

[10] In response to the working draft of this report, the Western Regional Office stated that, after it learned of the first Lompoc staff member who tested positive for COVID-19, it discussed staff assignments with Lompoc officials and they collectively made the decision to readjust the roster to stop relief post assignments that had Lompoc staff members working different areas of the complex. Though the BOP deployed the first TDY staff member to Lompoc on March 31, BOP documentation indicates that an additional 55 TDY staff members arrived at Lompoc between April 6 and April 14.

takes longer-term actions to address these issues, Lompoc will again face a shortage of medical and correctional staff when TDY staff return to their home institutions.[11]

## COVID-19 Staff Screening Procedures

On January 31, the BOP's Health Services Division issued a memorandum to all BOP institutions informing them of possible COVID-19 symptoms, including fever or chills, cough, shortness of breath, headaches, body or muscle aches, vomiting, and diarrhea.[12] On February 29, the BOP directed institutions to screen staff with potential COVID-19 risk factors, including staff members who had been in close contact with individuals diagnosed with COVID-19 or staff who had traveled within the previous 14 days through or from locations identified by the CDC as increasing epidemiologic risk.[13]

On March 13, the BOP issued a further directive instructing institutions in areas with "sustained community transmission," which included Lompoc, to implement enhanced health screening of all staff.[14] The memorandum provided that enhanced screening included "self-reporting and temperature checks."

> **USP Lompoc Hospital Care Unit**
>
> On May 4, the BOP announced that it had finalized construction of a Hospital Care Unit (HCU) inside the walls of USP Lompoc in order to care for a projected "level of hospitalization [among Lompoc inmates] the local community would be unable to meet." The BOP described the HCU as comprising 10 double-occupancy, acute care treatment rooms with negative pressure, as well as a Patient Intake Room, Nurses Station, Pharmacy, Linen Exchange Room, Biohazard Room, and Medical Supply and Storage Room. The BOP also stated that Lompoc had negotiated a contract for medical personnel, including Doctors, Registered Nurses, Paramedics, a Pharmacist, Physician Assistants, Nurse Assistants, and a Clinical Manager, to work in conjunction with the institution's Health Services staff. As a result, the BOP reported that cases normally requiring outside hospitalization would be treated within the prison, minimizing the impact on the community and further ensuring public safety. Lompoc's Executive Assistant told the OIG that the HCU started treating inmates on May 15.
>
> **Source:** OIG analysis of BOP documents

According to the BOP, initially all Lompoc staff were required to complete a form and submit to a temperature check. The BOP stated that subsequent screenings entailed a verbal screening in which screeners asked staff questions related to potential symptoms and performed a temperature check (see the photograph below). If a staff member had a fever or answered yes to any of the symptom questions, the staff member was required to complete a revised staff screening form.

---

[11] As of May 1, FCC Lompoc records indicate that 12 TDY staff, including 2 TDY medical staff, had returned to their home institutions. In response to the formal draft of this report, the BOP stated that off-site medical staff have been performing remote reviews of Lompoc inmates' medical records to fill the gap caused by the departure of TDY medical staff to allow Lompoc's medical staff to focus on on-site medical matters.

[12] BOP, memorandum for All Clinical Directors, Health Services Administrators, Quality Improvement/Infection Prevention Coordinators, Guidance on 2019 Novel Coronavirus Infection for Screening and Management, January 31, 2020, 2.

[13] BOP, memorandum for All Clinical Directors, Health Services Administrators, Quality Improvement/Infection Prevention Coordinators, Guidance Update for Coronavirus Disease 2019 (COVID-19), February 29, 2020, 2.

[14] BOP, memorandum for All Chief Executive Officers, March 13, 2020, 3.

We determined that while FCC Lompoc officials initiated COVID-19 screenings of all staff on March 16, in accordance with BOP policy, its initial screening process was not fully effective. Specifically, we identified two staff members who came to work in late March after experiencing COVID-19 symptoms, but their symptoms were not detected in the screening process. In one case the symptoms the staff member was experiencing were not included in the screening tool in place at Lompoc at the time, even though one of the staff member's symptoms was listed in the BOP's January guidance. As a result, the staff member was allowed to work at the institution despite experiencing those symptoms.[15] In the other case, the staff member was experiencing one of the symptoms that was included in the screening tool but the staff member did not report it because, he told us, he did not think it was COVID-19 related.[16] This staff member worked at Lompoc for 7 days after experiencing his first COVID-19 symptom and before he tested positive for COVID-19 in early April.[17]



FCC Lompoc COVID-19 Staff Screening Center
**Source:** BOP, with OIG enhancement

In addition, numerous Lompoc staff responding to our survey raised concerns about the effectiveness of staff screenings. Several Lompoc staff reported that nonmedical staff were conducting at least some of these screenings and that the institution was not always examining

---

[15] The BOP's Infection Prevention and Control Coordinator told us that the staff member had experienced mild COVID-19 like symptoms, such as fatigue and mild headaches, over the previous days before developing a fever and being tested for COVID-19 on March 26, one day after he last worked. The screening tool in place at the time included fever, cough, and shortness of breath and did not include other possible COVID-19 symptoms, such as headaches and diarrhea, identified in the January BOP guidance. The BOP stated in response to the formal draft of this report that this staff member did not experience any COVID-19 symptoms while working at the institution and developed fever, cough, and a sore throat, and was tested for COVID-19 on March 26. The testimonial evidence we obtained during our inspection indicated that there was at least 1 day that this staff member was symptomatic while working at Lompoc.

[16] The BOP staff member told the OIG that, while he experienced the onset of diarrhea on March 23 and a dry cough on March 26, he cleared the BOP's screening procedures because he did not have a fever and did not report to screeners his cough, which Lompoc staff were screening for at the time. This staff member told us that, when he returned to FCC Lompoc after 2 weeks, the institution was conducting a more in-depth screening for staff symptoms and was denying entry for staff members when they reported symptoms other than fever.

[17] In response to the working draft of this report, the BOP stated that it interviewed this staff member on April 4, after learning of his positive test result, and that was the time the BOP first learned of his COVID-19 symptoms. The BOP reported that Lompoc screened this staff member on each scheduled workday using the nationally approved staff member screening form.

staff for COVID-19 symptoms other than fever. Lompoc officials confirmed the use of both medical and nonmedical staff for COVID-19 screenings, after training nonmedical staff to do so, but asserted that the institution had always screened staff for COVID-19 symptoms other than fever. We believe that the limitations of the BOP's staff screening procecures in March, coupled with Lompoc staff who did not report all COVID-19 symptons to screening staff, may have contributed to the COVID-19 outbreak across FCC Lompoc.

## COVID-19 Testing

We found that testing of inmates and staff at FCC Lompoc was limited in late March, when the institution's COVID-19 outbreak began. On March 13, the BOP issued guidance to institutions regarding the screening of staff and inmates and testing of inmates.[18] Pursuant to the BOP's guidance, enhanced health screening of staff was to be implemented in areas with "sustained community transmission," as determined by the CDC, and at medical referral centers. The memorandum did not address staff testing. For inmates, the guidance provided that symptomatic inmates with exposure risk factors for COVID-19 were to be "isolated and tested" consistent with local health authority protocols.[19]

### Inmate Testing

We found that FCC Lompoc did not seek to test an inmate who, according to Lompoc medical records, informed staff on March 22 that he had begun to experience several different physical symptoms, including nausea, vomiting, and reported general malaise and a dry cough over the prior 2 days. Both vomiting and cough were known symptoms of COVID-19 at that time. According to this inmate's medical records, between March 22 and 26 Lompoc medical staff examined this inmate on four separate days before he was admitted to the local hospital, and that the inmate experienced fatigue, fever, cough, and chills before he was admitted to the hospital on March 26. Lompoc medical notes indicate that, because the inmate had not recently left the institution and had not been in contact with other known COVID-19 cases at the time, medical staff did not suspect that he had contracted the virus.[20] The inmate also had several preexisting

---

[18] BOP, memorandum for All Chief Executive Officers, March 13, 2020, 3.

[19] Isolation is used to separate people who (1) are infected with the virus (those who are sick with COVID-19 and those with no symptoms); (2) are awaiting test results; or (3) have COVID-19 symptoms from people who are not infected. In a correctional setting, the CDC recommends using the term "medical isolation" to distinguish it from punitive action. See CDC, "Interim Guidance."

[20] In response to the working draft of this report, the BOP provided an additional explanation about its process to diagnose and treat this inmate. The BOP stated that Lompoc staff considered COVID-19 for this inmate but determined that this diagnosis was unlikely because there were few COVID-19 cases in the local community, the inmate was afebrile and otherwise had an atypical COVID-19 presentation, and because the inmate denied any contact with anyone diagnosed with COVID-19 in the last 14 days. According to the BOP, this evaluation was consistent with the community standard being used at the time to consider patients for COVID-19. The BOP further stated that the fact that the inmate was seen 4 times in 5 days reflects appropriate ongoing monitoring of the inmate's illness. Finally, on March 26, when his condition was recognized as worsening, the BOP admitted the inmate to the local hospital where much of the focus was on the patient's significant gastrointestinal symptoms as well.

health issues. Further, according to the BOP's Infection Prevention and Control Coordinator, the hospital did not test the inmate for COVID-19 until March 27 because hospital staff initially suspected that the inmate had an infected gallbladder. On March 30, the inmate was confirmed to have COVID-19. Based on the BOP already having identified Lompoc as residing in an area of sustained community transmission, which resulted in the institution implementing enhanced screening protocols for staff by March 16, we believe that Lompoc should have taken greater precautions to isolate an inmate with an indeterminate illness that could have been related to COVID-19. Keeping this inmate in general population for several days increased the risk of COVID-19 transmission to institution staff and other inmates.[21]

Lompoc officials told us that on March 27 institution medical staff started testing inmates for COVID-19 if they exhibited COVID-19 symptoms. According to BOP data, FCC Lompoc had tested 121 inmates for COVID-19 as of April 29.[22]

On April 24, the BOP announced that it would expand testing to asymptomatic inmates, initially at institutions such as Lompoc with known COVID-19 cases.[23] Lompoc officials reported that the institution started testing for all 1,162 FCI inmates on May 4 through a contracted third party. By May 11, at least 891 FCI inmates had tested positive for COVID-19. Subsequently, Lompoc officials indicated to the OIG that the institution would not continue testing of all inmates because the outbreak at the USP and camps had subsided and universal testing was no longer warranted, although "targeted testing in specific units that have an active case" might be conducted on an as-needed basis.

## Staff Testing

A BOP official told us that at the onset of the COVID-19 outbreak some staff members faced challenges obtaining testing from their healthcare providers.[24] The official said that BOP resolved this issue on April 10 by working with the Santa Barbara County Public Health Department, which agreed to test FCC Lompoc staff members who could not otherwise be tested. Lompoc documentation showed that the Executive Staff sent emails to all staff informing them they could be tested at the Lompoc Health Care Center, a county facility, between 11 a.m. and 12 p.m. on certain days. At the time of our inspection in early May, at least 53 of the 416 staff members at

---

[21] News media reporting indicates that the first signs of community transmission in Santa Barbara County, California, where FCC Lompoc is located, were already evident as of March 15. Roselyn Romero, "First COVID-19 Case Reported in Santa Barbara County," *KSBY6 News*, March 15, 2020, www.ksby.com/news/coronavirus/first-COVID-19-case-reported-in-santa-barbara-county (accessed July 15, 2020).

[22] As of July 15, the BOP reported that 1,007 Lompoc inmates had tested positive for COVID-19, 843 inmates had tested negative, and 102 inmates had COVID-19 tests pending.

[23] For more information, see BOP, "BOP Expands COVID-19 Testing," April 24, 2020, www.bop.gov/resources/news/20200424_expanded_testing.jsp (accessed July 15, 2020).

[24] Lompoc officials reported to the OIG that they did not know why community healthcare providers denied COVID-19 testing to the staff members.

FCC Lompoc had been tested and approximately 60 percent (32 of 53) of those individuals had tested positive for the virus.

## Personal Protective Equipment and Cloth Face Coverings

We found that FCC Lompoc officials complied with initial and subsequent BOP directives implementing the CDC's guidance regarding the use of face coverings in correctional settings. However, by April 6, when the BOP directed the distribution of face coverings to all staff and inmates, Lompoc was experiencing both staff and inmate cases and, as subsequent data reflects, transmission and spread of the virus within the institution was already occurring.[25]

Between January 31 and April 6, the BOP issued seven policy directives intended to help its institutions implement evolving CDC guidance concerning the use of personal protective equipment (PPE) and face coverings in various scenarios.[26] Most notably, the BOP's March 18 directive required all BOP employees performing staff screenings to "wear appropriate personal protective equipment," defined as a "surgical mask, face shield/goggles, gloves and a gown."[27] On April 6, in response to revised CDC guidance on April 3 advising that face coverings be worn in public settings where social distancing measures are difficult to maintain, the BOP directed institutions to "[issue] surgical masks as an interim measure to immediately implement CDC guidance, given the close contact environment of correctional institutions."[28] We found that FCC Lompoc complied with this directive and first issued surgical masks to all staff and inmates on April 6.[29] However, this was 11 days after the hospitalization of a Lompoc inmate on March 26

---

[25] BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Update–Use of Face Masks, April 6, 2020.

[26] The CDC defines PPE as "a variety of barriers used alone or in combination to protect mucous membranes, skin, and clothing from contact with infectious agents." Depending on the situation, PPE may include gloves, surgical masks, N95 respirators, goggles, face shields, and gowns. Cloth face coverings are intended to keep the wearer from spreading respiratory secretions when talking, sneezing, or coughing. The CDC does not consider cloth face coverings to be PPE.

[27] BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Two Action Plan Update Number 1, March 18, 2020, 3. Initially, on March 13, the BOP issued guidance that employees screening staff for COVID-19 wear an N95 respirator. For more information, see BOP, memorandum for All Chief Executive Officers, March 13, 2020, 3.

[28] BOP, memorandum for All Chief Executive Officers, April 6, 2020, 1–2. The guidance indicated that the BOP would be distributing to institutions cloth face coverings, which would replace the use of surgical masks at that time. For more information, see CDC, "Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission," April 3, 2020, www.cdc.gov/coronavirus/ 2019-ncov/prevent-getting-sick/cloth-face-cover.html (accessed July 15, 2020).

[29] Acting Complex Warden, memoranda for FCC Lompoc Staff and Inmate Population, Face Masks, April 6, 2020, 1.

On April 13, the BOP issued nationwide guidance directing that "all staff and inmates will be issued and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved." BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Six Action Plan, April 13, 2020, 4.

with COVID-19 symptoms and 10 days after the first institution staff member tested positive for the virus on March 27.[30]

We asked BOP and Lompoc officials whether there were additional, proactive steps Lompoc officials could have taken regarding PPE to mitigate the emerging threat. BOP and Lompoc officials told us that Lompoc followed CDC recommendations regarding the use of PPE and that until April 3, when the CDC reported that asymptomatic individuals could spread the virus, there were no expert recommendations to distribute face coverings to all staff and inmates. Further, the BOP stated that proactively distributing face masks, which was not a proven, evidence-based strategy at a time when PPE resources were limited, would not have been appropriate. While BOP officials told us that issuing face masks would have been inappropriate, they also acknowledged that in hindsight inmates and staff not wearing face masks at this time probably contributed greatly to COVID-19 spread across FCC Lompoc.

In addition, although Lompoc officials maintained that the institution had sufficient levels of PPE at the time of our inspection, 70 percent (76 of 109) of Lompoc staff who responded to our survey indicated that more PPE for staff was an immediate need and 46 percent (50 of 109) of Lompoc staff who responded to our survey reported that inmates needed more PPE as well. Most commonly, Lompoc staff reported that the institution needed to provide staff with additional N95 respirators to adequately safeguard them from contracting the virus, particularly considering the widespread outbreak across the institution. Further, at the time of our inspection, a Lompoc staff member told us that not all correctional staff had been provided with eye protection, which had been a required item of PPE only for staff performing COVID-19 screenings or working in quarantine and medical isolation units.[31] Another Lompoc staff member responded to our survey that staff had been instructed to return and share eye protection with other staff, which the CDC

---

[30] According to FCC Lompoc officials, institution staff members received cloth face coverings on April 10 and inmates received cloth face coverings by April 14. However, a local union official expressed to the OIG concern about the quality of the cloth face coverings, comparing the material to burlap and stating that N95 respirators prevent 95 percent of containments whereas he believed that staff members' cloth face coverings were much less effective. Several Lompoc staff responding to the OIG's survey echoed these concerns and raised doubts that the cloth face coverings would adequately safeguard staff from contracting the virus.

[31] In response to the working draft of this report, BOP and Lompoc officials stated that there was never a shortage of PPE at Lompoc and that staff members who had a clinical need for N95 respirators were provided with them in accordance with CDC guidelines. The BOP also noted that PPE was recommended only for personnel conducting staff screenings and staff members working in the quarantine and isolation units.

Quarantine is used to keep someone who might have been exposed to COVID-19 away from others for 14 days to help prevent the spread of disease and determine whether the person develops symptoms. In a correctional setting, the CDC recommends, ideally, quarantining individuals in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, the person should be placed in medical isolation and evaluated for COVID-19. See CDC, "Interim Guidance."

8

has warned can increase the risk for transmission if the eye protection is not properly disinfected.[32]

## Lack of Permanent Leadership and Communications Protocols

We found that one additional factor that may have contributed to the challenges facing FCC Lompoc in responding to the spread of COVID-19 was that the institution had several key leadership vacancies across the complex and did not have communications protocols in place to fully inform staff about the spread of the virus. A Lieutenant, who had served as an acting Deputy Captain during the outbreak, told the OIG that having permanent, "seasoned leadership" at the onset of the outbreak would have benefited the complex's COVID-19 response. Further, a Lompoc staff member commented through the OIG's survey that USP Lompoc "had an acting Warden and no Captains, which likely led to [a] lack of decision making and action" and that "it was not until the [acting] Complex Warden from Tucson arrived [on March 31] that staff began to receive information and guidance." We observed that FCC Lompoc had been led by three different officials serving as the acting Complex Warden since the onset of the institution's outbreak and more than half (9 of 14) of the Lompoc management officials we interviewed were TDY staff or institution staff who had operated in an acting capacity since March.[33] In response to the working draft of this report, the BOP stated that an acting Warden was selected to oversee operations when the Complex Warden position became vacant on January 19, 2020. Further, the BOP stated that there was no lack of leadership because each official who had served as the acting complex Warden until the position was filled on June 7 had over 20 years of correctional experience.

In addition, a union official reported to us that during the early stages of the outbreak the institution did not inform staff members that they had been in close contact with a colleague who had tested positive for COVID-19. This failure to inform staff members of their contact with an infected person meant that BOP staff who had possibly been exposed to the virus—and therefore could themselves have been infected—were potentially exposing colleagues, inmates, and family members. The union official told us that the BOP has since addressed this issue and now informs staff members of potential exposure in a way that ensures employees' medical privacy.[34] In response to the working draft, Lompoc officials reported that they took significant measures to protect the safety and security of all staff, inmates, and members of the public during the

---

[32] CDC, "Eye Safety," July 29, 2013, www.cdc.gov/niosh/topics/eye/eye-infectious.html (accessed July 15, 2020).

In response to the working draft of this report, Lompoc officials stated that they instructed staff working in the quarantine and isolation units who used goggles and faces shields on how to properly sanitize this equipment and set up a sanitation station at entry points to these units.

[33] In April 2020, TDY staff assumed the Complex Warden, FCI Warden, FCI Deputy Captain, Operations Lieutenant, and two Associate Warden positions. The Deputy Case Management Coordinator position had been assumed by institution staff operating in an acting capacity. On June 7, a new permanent Complex Warden was designated to FCC Lompoc.

[34] To comply with Occupational Safety and Health Administration communication requirements, on April 8 the BOP provided all institutions with a "COVID-19 Notice to Staff" template letter for informing staff who may have been exposed to an individual who had tested positive for COVID-19.

COVID-19 pandemic. Specifically, the BOP stated that the leadership team provided information on a regular basis to all staff, department heads, and specific subject matter experts, in addition to continuous updates and guidance beginning with the BOP's Phase 1 guidance dated January 31, 2020. Though Lompoc officials provided many examples of guidance sent to Lompoc staff prior to the institution's COVID-19 outbreak in late March, we did not receive documentation of guidance addressing the need to inform staff members who had possibly been exposed to the virus because of their contact with an infected person.

## Conditions of Confinement, Visitation, Commissary, and Hygiene Products

We found that FCC Lompoc took several steps to modify institutional operations to increase social distancing in accordance with guidance issued by the BOP in March 2020. Specifically, on March 13 the institution suspended inmate social and legal visits in accordance with BOP-wide guidance.[35] Then, on April 1, FCC Lompoc advised inmates that the institution was restricting the movement of all inmates and was implementing a "Stay in Place" restriction to stop the spread of the virus.[36] During this time, inmates were allowed out of their cells only in small groups at designated times, on a limited basis, to access medical care, showers, phones, and email terminals.

By April 20, FCC Lompoc escalated its restrictions through a lockdown (for health-related purposes rather than security-related reasons) across all Lompoc facilities. This escalation suspended some inmates' access to showers, telephones, computer terminals, and commissary.[37] Lompoc officials told us that they implemented these additional restrictions because they believed them to be necessary to control the spread of COVID-19. The officials told us that they initially allowed inmates to shower in smaller groups; but, because COVID-19 cases continued to rise across the complex, they determined that more aggressive mitigation was necessary.

---

[35] On March 13, the BOP directed institutions to suspend all social and legal visits for 30 days, which was subsequently extended through at least July 31. The BOP guidance permitted institutions to accommodate case-by-case requests for legal visits. Further, the guidance stated that institutions should offer video conferencing as an alternative to in-person legal visits. BOP, memorandum for All Chief Executive Officers, March 13, 2020, 1–2.

[36] The BOP enacted a "14-day nationwide action to minimize movement to decrease the spread" of COVID-19 in its Phase Five Action Plan on April 1 and extended this action in its Phase Six and Phase Seven Action Plans. Some institutions chose to describe this action as a "Shelter in Place," "Stay in Place," or "Stay in Shelter." In announcing this action, the BOP noted that its "actions are based on health concerns, not inmate destructive behavior." See Appendix 3 for a timeline of the BOP's guidance to its institutions.

FCC Lompoc, Talking Points Town Hall, Advisory to the Inmate Population/COVID-19, April 1, 2020, 1.

[37] During the lockdown, approximately 1,000 USP inmates did not have access to showers. On May 8, Lompoc officials reported that the USP had relaxed its restrictions and initiated "very small, slow, controlled movements to allow inmates access to showers, emails, and telephones with social distancing and disinfecting protocols being followed." Though officials first indicated that the FCI lockdown had been extended to at least May 18, Lompoc reported to the OIG in June that FCI Lompoc lifted its enhanced mitigation measures in May after it had tested all FCI inmates. As of June 24, all FCC Lompoc facilities had implemented inmate movement restrictions consistent with Phase Seven of the BOP's national action plan (see Appendix 3).

In addition, the acting FCI Warden stated that the FCI suspended its commissary operation during the lockdown because the design of the institution was not conducive to social distancing.[38] Further, inmates were prohibited from accessing the law library to work on their legal cases. Correctional officials told us that inmates were still permitted to communicate with their legal representatives through special legal mail and that staff members could authorize legal phone calls for urgent matters. Lastly, during the lockdown, inmates were confined to their cells for 24 hours a day without recreation, which is more restrictive than conventional Special Housing Unit (SHU) placement. The OIG has found that such restrictions can raise significant mental health issues, and we asked Lompoc officials whether they took any steps to mitigate those potential concerns.[39] BOP officials responded that, consistent with standard BOP restrictive housing unit practices, Staff Psychologists conducted frequent rounds in all housing units and provided individual counseling to inmates on an as-needed basis. Additionally, psychology staff coordinated with other institution staff, such as Health Services staff, to ensure that inmates' mental health concerns were appropriately addressed and correctional staff provided inmates with self-help programming, reading materials, and other in-cell activities.

We were told that, to address inmates' hygienic needs, staff members provided inmates with multiple hygiene kits that contained a razor, a toothbrush, toothpaste, and soap bars so inmates could wash themselves at the sink in their cell. Despite these kits, 36 percent (39 of 109) of Lompoc staff who responded to our survey reported that more personal hygiene supplies, including soap and hand sanitizers, was an immediate need for inmates. With regard to hygienic supplies for staff, a Lompoc manager told us that the institution maintained adequate supplies and indicated that there were hand sanitizer stations for staff on every unit and in other locations throughout the institution. Further, he indicated that staff restrooms were well stocked with soap and paper towels and that staff could obtain new hand sanitizer bottles each day when they were screened. However, 55 percent (60 of 109) of Lompoc staff who responded to our survey reported that more hygiene supplies for staff was an immediate need, although only 1 of the survey respondents provided specific comments about the nature of their hygiene concerns.

We observed that, despite FCC Lompoc's efforts, its infrastructure may have limited its ability to implement the CDC's social distancing guidelines. FCC Lompoc has open bar cells (as opposed to solid doors), and inmates congregate in common areas, which can facilitate rapid community spread. Infrastructure issues are particularly concerning at the FCI, where inmates are housed open, dormitory style, with bunk beds 3 feet apart from each other (see the photograph below).[40]

---

[38] The BOP did not direct institutions to suspend commissary privileges.

[39] The OIG's 2017 restrictive housing report identified recent studies that suggested that the frequency, duration, and conditions of confinement of restrictive housing, even for short periods of time, can cause psychological harm and significant adverse effects on inmates' mental health. For more information, see DOJ OIG, *The Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, E&I Report 17-05 (July 2017), www.oig.justice.gov/sites/default/files/reports/e1705.pdf.

[40] The CDC advised that people stay at least 6 feet apart. For more information, see CDC, "Social Distancing," www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (accessed July 15, 2020).

Based on our review of BOP documents, FCC Lompoc Executive Staff reported the infrastructure concerns to the Office of the Attorney General on April 16. FCC Lompoc subsequently alleviated some of the issues by setting up cots for inmates in the FCI's gym and a closed UNICOR factory.[41] Further, in response to the formal draft of this report, the BOP stated that Lompoc officials added a total of 252 beds in non-housing locations such as the chapel, the visiting room, tents, and in a Residential Drug Abuse Program space, in



FCI Lompoc Housing Unit
**Source:** BOP, with OIG enhancement

addition to the locations already mentioned. Still, social distancing issues remained at the FCI and, by May 11, the BOP reported that about 77 percent (891 of 1,162) of all FCI inmates had tested positive for COVID-19 and were considered active cases.

## Quarantine Procedures

We found that FCC Lompoc complied with BOP directives by taking steps to quarantine inmates to mitigate COVID-19 transmission.[42] According to Lompoc officials, the institution first established a quarantine and isolation unit on a range in the USP's SHU to house the last transfer of incoming inmates. Correctional officials indicated that the quarantine unit was then relocated to an unused USP Lompoc housing unit (H-Unit) on March 27, while the isolation unit remained on the SHU range at that time. On April 2, Lompoc officials relocated the isolation unit to the H-Unit to accommodate the rise in COVID-19 cases across the complex and the quarantine unit was moved to the USP's M-Unit (see the photograph below). At the time of our inspection, the BOP's Infection Prevention and Control Coordinator told us that institution staff had placed the last transfer of incoming inmates into quarantine in the USP Lompoc's M-Unit. FCC Lompoc Executive Staff stated that the only new inmates on the compound in April were 18 voluntary surrenders to the institution (which FCC Lompoc cannot control), all of whom were designated to the M-Unit for

---

[41] Federal Prison Industries, called UNICOR, is a government corporation within the BOP that provides employment to inmates at federal prisons throughout the United States.

[42] BOP, memoranda for All Chief Executive Officers, March 13, 2020, 3, and April 13, 2020, 3–4.

quarantine.[43] Consistent with Lompoc officials' statements, the OIG survey results indicate that the institution followed a minimum 2-week quarantine for incoming inmates and medical isolation for inmates exhibiting COVID-19 symptoms. However, 50 percent (55 of 109) of Lompoc staff who responded to our survey reported that the institution needed additional space to successfully continue to quarantine inmates and only 31 percent (32 of 104) of Lompoc staff who responded to our survey indicated that inmates who had been in close contact with a symptomatic inmate were quarantined for 14 days.

## Use of Home Confinement and Compassionate Release Authorities

In response to the COVID-19 pandemic, the Attorney General authorized the BOP, consistent with pandemic-related legislation enacted in late March 2020, to reduce the federal prison population by transferring inmates from prison to home confinement.[44] In an April 3 memorandum, the Attorney General also directed the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" at



At the time of our inspection, FCC Lompoc used the H-Unit to medically isolate inmates suspected of having contracted COVID-19 or those who had tested positive for the virus.

**Source:** BOP, with OIG enhancement

those prisons "where COVID-19 is materially affecting operations."[45] The BOP assigned to its Central Office the responsibility for developing guidance implementing the Attorney General's directives and initially identifying inmates who would be considered for possible transfer to home confinement.

Over the next 5 weeks, the BOP Central Office issued three guidance memoranda and sought to assist institutions in identifying eligible inmates by providing them with rosters of inmates that the Central Office determined might be eligible for transfer pursuant to the BOP's guidance. The Central Office's initial policy guidance in early April was focused on transferring to home

---

[43] The term "voluntary surrender" refers to an inmate reporting to a BOP institution of his or her own volition after a federal court orders the inmate to do so, rather than being transported there by law enforcement officials.

[44] Home confinement, also known as home detention, is a custody option whereby inmates serve a portion of their sentence at home while being monitored.

[45] William P. Barr, Attorney General, memorandum for Director of Bureau of Prisons, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19, April 3, 2020, www.justice.gov/file/1266661/download (accessed July 15, 2020), 1.

confinement those inmates who faced the greatest risks from COVID-19 infection, including elderly inmates. In late April, the BOP began to expand its use of home confinement to cover inmates other than those who were elderly or at high risk for serious illness due to COVID-19, as determined by CDC guidance. In addition, the BOP allowed institution Wardens to identify inmates otherwise ineligible for home confinement under Central Office guidance criteria and to seek approval from the Central Office to transfer those inmates to home confinement.

During the period from April 4 to May 15, the BOP Central Office sent FCC Lompoc 9 rosters, identifying 509 inmates in total, who the Central Office determined were potentially eligible for transfer to home confinement. We found that Lompoc officials followed Central Office guidance that required Lompoc to review its inmates (including but not limited to those on the rosters), by examining each inmate's criminal history and risk of recidivism, conduct in prison, health conditions, and home release plan, to determine whether the inmate met the BOP criteria for transfer to home confinement. This review process, coupled with a 14-day prerelease quarantine period the BOP required to ensure that inmates placed into the community did not have COVID-19, resulted in 3 or more weeks between the time the Central Office identified an inmate for transfer consideration to the date the inmate was actually transferred to home confinement. As a result, we found that in April FCC Lompoc's ability to use home confinement in response to the spread of COVID-19, as a mechanism to reduce either the at-risk inmate population or the overall prison population and facilitate social distancing, was extremely limited. Indeed, as of May 13, over 900 Lompoc inmates had contracted COVID-19 and we determined that only 8 inmates had been transferred to home confinement in accordance with the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) authorities and BOP guidance.

### Attorney General and BOP Memoranda Regarding the Use of Home Confinement

On March 26, the Attorney General directed the BOP to prioritize the use of home confinement as a tool to combat the dangers that COVID-19 posed to "at-risk inmates who are non-violent and pose minimal likelihood of recidivism."[46] At the time, the BOP had the authority to transfer an inmate to home confinement for the final months of his or her sentence, subject to the following statutory limitations: (1) for any inmate, the shorter of 10 percent of the term of imprisonment or 6 months; (2) for an inmate age 60 or older, up to one-third of his or her sentence, if he or she met certain additional criteria; and (3) for a terminally ill inmate, any period of time, if he or she met certain additional criteria.[47] The Attorney General's memorandum identified a "non-exhaustive"

---

[46] William P. Barr, Attorney General, memorandum for Director of Bureau of Prisons, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic, March 26, 2020, www.justice.gov/file/1262731/ download (accessed July 15, 2020).

[47] 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541(g)(5)(A). Additionally, federal law allows the BOP Director to seek court approval to modify an inmate's sentence of imprisonment for "extraordinary and compelling reasons," which is commonly referred to as "compassionate release" (18 U.S.C. § 3582(c)). As we describe below, following the issuance of the Attorney General's April 3 memorandum the BOP Director did not need to seek judicial approval under § 3582(c) if he determined that an inmate should be transferred to home confinement.

list of factors that the BOP should consider in determining whether to transfer an inmate to home confinement. Those factors included:

- the age and vulnerability of the inmate to COVID-19, based on CDC guidelines;

- the security level of the institution where the inmate was currently housed, with priority given to those in low and minimum security facilities;

- the inmate's disciplinary history, with inmates who engaged in violent or gang-related activity in prison, or who incurred a BOP violation during the prior 12 months, not receiving priority treatment;

- the inmate's Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN) score, with inmates exceeding a minimum score not receiving priority treatment;[48]

- whether the inmate had a verifiable reentry plan "that will prevent recidivism and maximize public safety;" and

- the inmate's crime of conviction.

The memorandum further required an assessment by the BOP Medical Director, or designee, of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 infection at the inmate's prison facility, and the risks of COVID-19 infection at the planned home confinement location.

The following day, on March 27, the President signed into law the CARES Act, which authorized the BOP Director to lengthen the maximum amount of time that an inmate may be placed in home confinement "if the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP]."[49] The following week, on April 3, the Attorney General issued a memorandum, entitled "Increasing Use of Home Confinement at Institutions Most Affected by COVID-19," which found, as provided for in the CARES Act, "that emergency conditions are materially affecting the functioning of the [BOP]."[50] As a result of that finding, the BOP Director was authorized by the CARES Act to increase the amount of time that inmates could be placed in home confinement. The memorandum instructed the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" at those prisons "where COVID-19 is

---

[48] To assess inmates' recidivism risk, the BOP uses the PATTERN system, which the Department developed in response to the FIRST STEP Act of 2018. The FIRST STEP Act directed the Department to complete its initial risk and needs assessment for each federal inmate by January 15, 2020. Among other things, PATTERN calculated inmates' recidivism risk using a point system that classifies inmates into either minimum, low, medium, or high risk categories based on: (1) infraction convictions during current incarceration, (2) number of programs completed, (3) work programming, (4) drug treatment while incarcerated, (5) noncompliance with financial responsibility, (6) history of violence, (7) history of escapes, (8) education score, (9) age at time of the assessment, (10) instant violent offense, (11) history of sex offense, and (12) criminal history score. For more information, see Office of the Attorney General, *The First Step Act of 2018: Risk and Needs Assessment System—Update* (January 2020), www.nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf (accessed July 15, 2020).

[49] Pub. L. No. 116-136.

[50] Barr, memorandum for Director of Bureau of Prisons, April 3, 2020.

materially affecting operations." In assessing inmates for transfer to home confinement, the memorandum stated that the BOP should be "guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations."

In response to the Attorney General's memoranda, the BOP issued three policy memoranda, on April 3, April 22, and May 8, 2020. The BOP's April 3 memorandum provided institutions with "sample rosters...to aid in the identification of inmates who may be eligible for home confinement" and stated that eligible inmates "must be reviewed utilizing [the BOP's] Elderly Offender Home Confinement Program criteria and the discretionary factors listed in the [Attorney General's March 26 memorandum]."[51] As mentioned above, among the discretionary factors were an inmate's age and vulnerability to COVID-19, based on CDC guidelines, which include people 65 years and older and people of all ages with underlying medical conditions.[52] The April 3 memorandum also stated that inmates were required to have "maintained clear conduct for the past 12 months to be eligible." It further provided that pregnant inmates should be considered for placement in home confinement or an available community program.

The BOP's April 22 memorandum expanded the number of inmates eligible for consideration for transfer to home confinement, as authorized by the Attorney General's April 3 finding pursuant to the CARES Act.[53] Specifically, the memorandum stated that the BOP was prioritizing for home confinement consideration those inmates who either (1) had served 50 percent or more for their sentence or (2) had 18 months or less remaining on their sentence and had served 25 percent or more. In assessing whether inmates who met the expanded prioritization criteria were candidates for home confinement, the memorandum continued to apply the criteria from the Attorney General's March 26 memorandum. Additionally, the memorandum continued to provide that pregnant inmates should be considered for placement in home confinement or an available community program. Finally, the BOP's memorandum allowed a Warden to seek approval from the BOP Central Office to transfer to home confinement an inmate who did not meet the memorandum's criteria if the Warden determined that transfer was necessary "due to [COVID-19] risk factors, or as a population management strategy during the pandemic." We note, however, that the April 22 memorandum did not specifically address the instruction in the Attorney

---

[51] The criteria in the BOP's Elderly Offender Home Confinement Program generally mirror those found in § 603 of the FIRST STEP Act, 34 U.S.C. § 60541 and require an inmate to, among other things, be at least 60 years old, have served at least two-thirds of his or her prison sentence, and not have been convicted of a crime of violence or sex offense.

[52] CDC guidelines state that people with chronic lung disease, moderate to severe asthma, serious heart conditions, severe obesity, diabetes, chronic kidney disease, and liver disease, particularly if not well controlled, are at high risk for severe illness from COVID-19. The guidelines also identify people who are immunocompromised as being at risk. The guidelines state that many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications. CDC, "People Who Are at Increased Risk for Severe Illness," www.cdc.gov/ coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (accessed July 15, 2020).

[53] The BOP's April 22 memorandum rescinded its April 3 memorandum.

16

General's April 3 memorandum that the BOP "immediately maximize appropriate transfers to home confinement" at those institutions "where COVID-19 is materially affecting operations," and "that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations."

The BOP's third memorandum, issued May 8, was generally consistent with its April 22 memorandum, with one specific difference.[54] The May 8 memorandum permitted inmates to be considered for transfer to home confinement despite having committed certain misconduct in prison during the prior 12 months if, in the Warden's judgment, home confinement "does not create an undue risk to the community." The May 8 memorandum, like the April 22 memorandum, did not specifically address the Attorney General's instruction that the BOP "immediately maximize appropriate transfers to home confinement" at institutions most affected by COVID-19, nor did it specify that inmates at such institutions "with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention."

## OIG Estimate of Lompoc Inmates Potentially Eligible for Home Confinement Consideration Based on BOP Guidance and Available Authorities

In order to independently assess the number of FCC Lompoc inmates potentially eligible for transfer to home confinement applying the authorities described above and the BOP guidance criteria, the OIG's ODA used data from the BOP's inmate management system, SENTRY. That data did not allow the ODA to replicate every criterion used by the BOP to determine home confinement eligibility; as a result, in some instances the ODA used certain proxies. For example, in applying the public safety criteria in the BOP guidance, the ODA considered all inmates at a minimum or low security level as potentially eligible for home confinement, whereas the BOP considered certain additional public safety factors that may have limited the eligibility of some of those inmates for home confinement consideration. Separately, in estimating the number of inmates who were eligible for transfer to home confinement under 18 U.S.C. § 3624(c)(2) prior to enactment of the CARES Act, the ODA included only those inmates in minimum or low security facilities with 6 months or less remaining, although the statute applies to all inmates regardless of the security level of the institution where they are incarcerated but limits placement into home confinement to no more than 10 percent of an inmate's sentence.[55] Further, in determining the number of inmates who were at high risk of severe illness from COVID-19 and therefore were eligible for home confinement consideration under BOP guidance, the ODA included inmates aged 65 or older only. Determinations about whether specific underlying medical conditions for inmates under age 65 placed them in a high risk category or made them appropriate for transfer

---

[54] The BOP's May 8 memorandum rescinded its April 22 memorandum.

[55] 18 U.S.C. § 3624(c)(2) states that "the authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. The [BOP] shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph."

were made by the institution based on a case file review, which the OIG did not undertake in connection with our remote inspection.[56]

Based on the available data, the ODA estimated that, as of April 12, approximately 957 of the 1,775 inmates in Lompoc's low and minimum security facilities were potentially eligible for home confinement under existing authorities and BOP guidance. By comparison, as detailed above, the BOP Central Office included 509 inmates in the 9 rosters it provided to FCC Lompoc for home confinement consideration between April 4 and May 15.[57] The table below details the ODA's estimated number of inmates eligible for transfer by available authority or BOP guidance factor.

**Table**

## OIG Estimate of the Number of Lompoc Inmates Eligible for Transfer to Home Confinement Based on BOP Guidance and Available Authorities

| Authority | 18 U.S.C. § 3624(c)(2) Prior to the CARES Act | FIRST STEP Act: Pilot Program for Elderly, Nonviolent Offenders | Post-CARES Act and the Attorney General's April 3 Finding: BOP Implementing Guidance | |
|---|---|---|---|---|
| **Inmate Population** | Inmates in low and minimum facilities with a remaining sentence of 6 months or less | Inmates in low and minimum facilities at least 60 years of age and having served at least two-thirds of their sentence | Inmates in low and minimum facilities and at least 65 years of age (i.e., at high risk according to the CDC) | Inmates in low and minimum facilities, under the age of 65, and having served at least 50 percent of sentence or at least 25 percent with 18 months or less remaining |
| **Number of Inmates as of April 12, 2020** | 115 | 50 | 84 | 708 |

Notes: Some inmates may have been eligible for transfer under multiple authorities, but the table counts each inmate only once. If eligible under multiple authorities, the inmate would be counted under the first authority for which he was eligible, moving from left to right.

**Sources:** 18 U.S.C. § 3624(c)(2); 34 U.S.C. § 60541(g); CARES Act, Pub. L. No. 116-136; and OIG data analysis

---

[56] According to the BOP's Administrator of Reentry Services, different institutions may have different interpretations of how severe a medical condition deemed by the CDC as high risk must be for the inmate to be considered eligible for home confinement. As noted below, Health Services staff evaluated whether an inmate's medical needs could still be met if the inmate was placed into the community.

[57] Our review of the BOP's 9 rosters shows that the 509 Lompoc inmates included 354 previously designated low risk inmates on the BOP's May 8 roster (Roster 7), whom Lompoc staff had to rescore using the BOP's new PATTERN Risk Scoring Form (rev. January 2020). According to BOP guidance, Lompoc inmates who were classified as minimum risk under the new PATTERN Risk Scoring Form were then reassessed by the Central Office to determine their potential eligibility for home confinement placement. As we noted above, the OIG's ODA used data from the BOP's inmate management system, SENTRY, to assess the universe of potentially eligible Lompoc inmates. The ODA did not have data to replicate all of the criteria that the BOP used to determine home confinement eligibility, which included the BOP's PATTERN risk data.

## FCC Lompoc's Use of Home Confinement

To facilitate institutions' implementation of the Attorney General's directives, the BOP Central Office created and disseminated to institutions a series of rosters applying the factors identified in the criteria from the BOP memoranda. FCC Lompoc received nine different rosters from the Central Office between April 4 and May 15, and BOP officials stated that multiple rosters were provided because each successive BOP memorandum expanded the inmate eligibility criteria. Lompoc's rosters identified 509 inmates who were potentially eligible for transfer to home confinement.

Upon receipt of each roster, FCC Lompoc's Unit Team, Health Services, and Special Investigative Supervisor staff reviewed the case files for each inmate to assess whether the inmate should be considered for transfer to home confinement based on the factors identified in the BOP's current memorandum. According to a BOP Assistant Director, who served as Lompoc's acting Complex Warden from May 6 to June 5, the BOP redirected staff at the local, regional, and community confinement levels and dedicated staff full-time at the institution level to review inmates' case files to determine their eligibility and confirm release plans. As a result, he indicated that the BOP had reduced the duration of its normal release process from 2–3 months to a couple of weeks.

As part of FCC Lompoc's efforts to evaluate the rosters of inmates identified by the BOP Central Office as potentially eligible for home confinement, institution staff conducted a public safety determination. Lompoc's acting Deputy Case Management Coordinator told us that the Unit Team staff assessed whether each inmate had any disqualifying public safety factors and Special Investigative Supervisor staff determined whether the inmate had gang affiliations or otherwise presented a risk to public safety. In addition, Health Services staff evaluated whether the inmate's medical needs could still be met if he was placed in home confinement.

A Lompoc official told the OIG that by May 13 the institution had determined that approximately 150 inmates identified by the BOP Central Office were eligible to be transferred to home confinement or an RRC pursuant to the criteria in the Attorney General's and BOP's memoranda; however, by that date, only 9 of those inmates had been placed into home confinement or an RRC under the CARES Act.[58] We were also told that during this time Lompoc continued to process for transfer into an RRC or home confinement inmates who were qualified to leave prison under authorities that existed prior to the CARES Act and that between March 26 and May 13 Lompoc transferred 25 inmates out of the institution through its routine reentry process.

Lompoc reported to the OIG that by June 24 the number of its inmates who had been placed into home confinement or an RRC since March 26 had increased from 34 to 124. Lompoc data indicated that 38 of these inmates had been placed into home confinement while 86 of them had

---

[58] We spoke to this official 2 days before Lompoc received its ninth and most recent roster of potentially eligible inmates, which included 16 inmates who were over the age of 65. In June, this official told us that Lompoc had since determined that as of June 5 at least 216 inmates had been deemed eligible under the Attorney General's home confinement directive.

been placed into an RRC; however, a Lompoc official told us that the institution could not always tell whether inmates placed directly into an RRC were there only temporarily before transferring to home confinement.[59] In June, Lompoc also reported that it had referred an additional 14 inmates with age risk factors to the BOP Central Office for home confinement consideration under the provision of the BOP's April 22 and May 8 memoranda that allowed Wardens to refer inmates who did not meet either the 50 percent or 25 percent criteria or the public safety factors.[60] Documentation we reviewed indicated that the BOP had approved 1 of the 14 inmates for transfer to home confinement or an RRC.

We asked the then acting Complex Warden why, as of May 13, only 34 Lompoc inmates had been moved out of prison, given the impact of the COVID-19 pandemic that the facility began to experience in late March. He explained that the institution cannot move an eligible inmate to home confinement or an RRC until the local RRC that will be assuming responsibility for monitoring the inmate, whether in home confinement or an RRC, has confirmed that it is able to do so.[61] He added that during the COVID-19 pandemic this has sometimes delayed releasing eligible inmates to home confinement or an RRC. He stated that some RRCs are short staffed, which presents significant challenges given the increased number of inmates throughout the country whom the BOP has transferred into RRC supervision at RRC facilities and in home confinement.[62] We learned from another Lompoc official that COVID-19 outbreaks in two RRCs delayed two Lompoc inmates from transferring to them. We also learned that additional factors affected BOP institutions' ability to move eligible inmates out of prison, including the role of the U.S. Probation Office in approving relocations, the need for a suitable home address, and an inmate's ability to receive healthcare in the community.

---

[59] In comparison, we were advised that between December 2019 and February 2020 Lompoc did not place any inmates into home confinement but placed 151 inmates into RRCs.

A 2016 OIG audit report found that the BOP could more strategically identify inmates suitable for placement directly into home confinement and that the BOP had underutilized home confinement placement as an alternative to RRC placement for transitioning low risk, low need inmates back into society despite BOP policy and guidance stating that direct home confinement placement was preferred for such inmates. See DOJ OIG, *Audit of the Federal Bureau of Prisons' Management of Inmate Placements in Residential Reentry Centers and Home Confinement*, Audit Report 17-01 (November 2016), www.oversight.gov/sites/default/files/oig-reports/a1701.pdf.

[60] On June 23, the BOP's Residential Reentry Services Branch Administrator told the OIG that the Home Confinement Review Committee's records indicated that Lompoc had referred only four inmates to the committee for a home confinement suitability review, with the first inmate being referred on June 17.

[61] Inmates transferred from a BOP institution to home confinement prior to the conclusion of their prison sentence remain subject to BOP monitoring while under home confinement. As a general matter, the BOP contracts with RRCs to monitor such inmates. According to the BOP's Residential Reentry Services Branch Administrator, RRC staff monitor more than 90 percent of the approximately 7,000 inmates who were placed into home confinement as of June 23.

[62] BOP officials stated that inmates were transferred to home confinement as soon as the necessary release preparation measures were completed, including verification of the inmate's home address and confirmation with family members that the inmate's release plan was viable and could be fulfilled in the home environment.

We asked Lompoc's then acting Complex Warden why Lompoc had determined that most of the 509 inmates referred by the BOP Central Office were ineligible for transfer to home confinement or an RRC. He told us that, while Lompoc viewed the Attorney General's directives as a way to reduce the inmate population to better facilitate social distancing within its facilities, the institution also had a responsibility to ensure that inmates who posed a risk to public safety were not released into the community. He noted that many inmates housed in low and minimum security facilities may appear to present minimal risk to the community based on their current institution security level, but that some have criminal histories including violence and sex offenses that preclude them from home confinement placement. He further explained that inmates initially classified as high security can, over time, work their way down to low or minimum security designations through good institutional conduct. As a result, the institution had to review the case file for each potentially eligible inmate and could not make generalized determinations of eligibility.

The OIG recognizes and appreciates the importance of the public safety considerations associated with the potential release of a BOP inmate and the challenges that BOP officials face in determining whether to transfer an inmate to home confinement. These are difficult, risk-based decisions. However, we also note that in early April, at a time when Lompoc was facing a growing COVID-19 outbreak, the BOP had been given authority to expand existing release criteria and the Attorney General had directed the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" at prisons, like Lompoc, "where COVID-19 is materially affecting operations." Despite this admonition, the data does not reflect that the BOP took immediate action at Lompoc. For example, as of April 12, approximately 115 low and minimum security Lompoc inmates had 6 months or less remaining in their sentence. Under the law, upon completion of an inmate's sentence, the BOP is obligated to release the inmate from prison. Therefore, these 115 low and minimum security inmates were going to be returning to their communities no later than early October, many likely much sooner. Moreover, nearly all of these inmates would have been eligible for immediate home confinement consideration under BOP guidance and existing law.[63] While we recognize that some of these low and minimum security inmates may not have been candidates of transfer to home confinement because they did not have a residence to go to, or due to their actions while incarcerated or prior criminal histories, we found that 87 percent (100 of 115) of these inmates remained at FCC Lompoc as of May 10, more than a month after the Attorney General's memorandum. By June 14, 38 percent (44 of 115) of these inmates continued to reside at Lompoc. As a result, we concluded that the BOP did not fully

---

[63] While 18 U.S.C. § 3624(c)(2) would normally have limited the maximum amount of time that such inmates could be placed in home confinement to 10 percent of their prison sentence, the BOP's post-CARES Act guidance eliminated the 10 percent restriction for inmates who had 18 months or less remaining to their sentence and had already served 25 percent of their sentence. This meant that any inmate who had less than 6 months remaining on an 8 month or longer sentence could immediately be considered for home confinement. According to the BOP, approximately 98 percent of defendants sentenced to a term of imprisonment have received a sentence of at least 1 year.

leverage its expanded authorities under the CARES Act and the Attorney General's memoranda to promptly transfer Lompoc inmates to home confinement.[64]

## Compassionate Release

Another means by which inmates can be moved from prison to home is through a reduction to their sentence pursuant to the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i).[65] Under the statute, either the BOP or an inmate may request that a federal judge reduce the inmate's sentence for "extraordinary and compelling reasons," such as age, terminal illness, other physical or medical conditions, or family circumstances. An inmate must first submit a compassionate release request to the BOP, but the inmate is permitted to file a motion directly with the court if the BOP denies the petition, or 30 days after the inmate files the petition with the BOP, whichever occurs first.

We were told that the BOP prioritized using the home confinement authorities described above, rather than the compassionate release statute, to respond to the COVID-19 pandemic because those authorities allowed the BOP to approve inmates for release whereas compassionate release requires the approval of a federal judge. Officials in the BOP's Office of General Counsel told us that the COVID-19 pandemic has not changed the BOP's eligibility requirements for compassionate release. Additionally, the Department has taken the position, in legal guidance when responding to compassionate release motions filed by inmates with courts, that the risk of COVID-19 by itself is not an "extraordinary and compelling" circumstance that should result in the grant of a compassionate release request.[66] Thus, COVID-19 would not cause the BOP to support a petition for compassionate release that it would not have supported otherwise.

---

[64] As noted previously, a class action lawsuit on behalf of Lompoc inmates was filed in May 2020 in the U.S. District Court for the Central District of California concerning the BOP's response to the COVID-19 pandemic at FCC Lompoc. On July 14, a U.S. District Court Judge approved a provisional class certification for Lompoc inmates over the age of 50 or with underlying health conditions. The Judge's order states that "the evidence before the court demonstrates meaningful social distancing is not possible at Lompoc absent a reduction in the inmate population," and that "there is no evidence [BOP officials] are prioritizing their use of statutory authority under the CARES Act to grant home confinement to Lompoc inmates in light of the pandemic, or giving due consideration to inmates' age or medical conditions in evaluating eligibility of home confinement." The Judge ordered the BOP to, among other things, "make full and speedy use of the BOP's authority under the CARES Act and evaluate each class member's eligibility for home confinement." See *Torres et al.: Plaintiff-Petitioners, v. Milusnic et al.: Defendant-Respondents*, Case 2:20-cv-04450-CBM-PVC, July 14, 2020, www.prisonlaw.com/wp-content/uploads/2020/07/Lompoc-Order-re-PI-and-Class-Cert.pdf (accessed July 22, 2020).

[65] For more information about how the BOP manages its compassionate release program, see BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), January 17, 2019. In 2013, the OIG issued a report examining the BOP's compassionate release program. The OIG found, at that time, that the program had been poorly managed and inconsistently implemented. See DOJ OIG, *The Federal Bureau of Prisons' Compassionate Release Program*, E&I Report I-2013-006 (April 2013), www.oversight.gov/sites/default/files/oig-reports/e1306.pdf.

[66] Executive Office for United States Attorneys, "Compassionate Release Litigation Guidance," May 18, 2020.

As a result of the COVID-19 pandemic, FCC Lompoc reported that the institution has processed about 20 times the typical volume of compassionate release petitions from Lompoc inmates, from usually about 10 applications a month to 201 applications in April 2020 alone. A Lompoc official told us that the vast majority of inmates who applied for compassionate release during the COVID-19 pandemic did not appear to be eligible under the program's criteria. On May 27, Lompoc reported that 9 out of approximately 387 inmates who had applied for compassionate release since March 1 had been released and that by June 5 the BOP had agreed to file motions with the court for the compassionate release of 3 additional inmates.

To provide more insight into these issues, the OIG is reviewing and will report separately on the Department's and the BOP's use of early release authorities, especially home confinement, to manage the spread of COVID-19 within BOP facilities.

23

Case 3:16-cr-00034-JAG  Document 44-1  Filed 12/23/20  Page 31 of 37 PageID# 311
Case 2:12-cr-00241-WBS-DB  Document 128  Filed 10/27/21  Page 38 of 77

**APPENDIX 1**

# SCOPE AND METHODOLOGY OF THE INSPECTION

The OIG conducted this inspection in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (January 2012). We conducted this inspection remotely because of CDC guidelines and DOJ policy on social distancing. This inspection included telephone interviews with Lompoc officials, review of documents produced by the BOP related to the BOP's and Lompoc's management of the COVID-19 pandemic, the results of an OIG survey issued to all BOP staff, and analysis of publicly available BOP and COVID-19 data. We also considered a complaint we received from a union official at FCC Lompoc and complaints reported to the OIG Hotline. The photographs included in the report were taken by Lompoc officials for the purpose of providing the Office of the Attorney General with information about Lompoc's response to COVID-19 and at the OIG's request for this inspection.

To understand staff concerns, impacts, and immediate needs related to COVID-19, we issued an anonymous electronic survey to all BOP government employees from April 21 through April 29, 2020. We invited these 38,651 employees to take the survey and received 10,735 responses, a 28 percent response rate. Institution staff represented 9,932 of the 10,735 responses (93 percent). We received 126 survey responses from Lompoc personnel, representing 30 percent of staff assigned to the institution.

We conducted telephone interviews with BOP and local union officials, a Chief Executive of the Lompoc Valley Medical Center, and the FCC Lompoc Case Management Coordinator, Clinical Director, Deputy Case Management Coordinator/Case Manager, Unit Manager, and three Lieutenants. We also conducted a group telephone interview with 11 FCC Lompoc, BOP regional, and Central Office officials. We did not interview inmates as part of our remote inspection of FCC Lompoc.

The main issues we assessed through our interviews and data requests were the institution's compliance with BOP directives and CDC guidance related to PPE; COVID-19 testing; medical response and capability; social distancing, quarantine, sanitation, supplies, and cleaning procedures; and conditions of confinement. We also assessed actions taken to reduce the inmate population through implementation of relevant authorities.

We reviewed CDC guidelines and BOP-wide guidance and procedures, as well as the FCC Lompoc Fit Test Staff Roster, Community Relations Board information, media statements, documentation of staff COVID-19 screenings, PPE guidance and inventory, Quarantine Checklist, and information and guidance provided to staff.

Case 3:16-cr-00034-JAG   Document 44-1   Filed 12/23/20   Page 32 of 37 PageID# 312
Case 2:12-cr-00241-WBS-DB   Document 128   Filed 10/27/21   Page 39 of 77

APPENDIX 2

# OIG COVID-19 SURVEY RESULTS FOR FCC LOMPOC



| Open Period: | Invitations Sent: | Overall Responses: | Lompoc Responses: |
|---|---|---|---|
| April 21–29, 2020 | 38,651 | 10,735 (of 38,716) | 126 (of 416) |

**Lompoc Responses: Departments 114 (of 126 responses):**

**Correctional Services: 29% | Health Services: 11% | Facilities Management: 11% | All Other Departments: 49%**

**Which of the following are immediate needs for your institution during the COVID-19 pandemic? (Top 5 Responses)**



Lompoc (N=109)
BOP-wide (N=8,153)

| Need | Lompoc | BOP-wide |
|---|---|---|
| More PPE for staff | 68% | 70% |
| Additional staff to cover posts | 59% | 70% |
| More personal hygiene supplies for staff | 49% | 55% |
| More space to quarantine inmates | 23% | 50% |
| More PPE for inmates | 39% | 46% |

*Note: Personal hygiene supplies are defined as soap and hand sanitizer.*

**Which of the following statements best describes the current guidance you have received from facility leadership about what you should do if you have been exposed to COVID-19? (Top 2 Responses)**

■ Lompoc (N=117)   ▨ BOP-wide (N=9,163)

| Statement | Lompoc | BOP-wide |
|---|---|---|
| I have been advised that I should continue to report to work unless I experience symptoms. | 53% | 45% |
| I have been given conflicting guidance on what I should do if I have been exposed to COVID-19. | 23% | 19% |

**How strongly do you agree with the following statements about the adequacy of the guidance you have received about what you should do if you have been exposed to COVID-19? (All Responses)**

*Respondents rated each item on a 5-point scale, with "strongly disagree" worth 1 point and "strongly agree" worth 5 points. "Don't know" responses are excluded.*

| | Lompoc Rating | BOP-wide Rating |
|---|---|---|
| The guidance was timely. | 2.45 | 3.18 |
| The guidance was clear. | 2.46 | 2.97 |
| The guidance was comprehensive. | 2.44 | 3.03 |

25

**How strongly do you agree with the following statements about the adequacy of the practices your institution is taking to mitigate the risk of spreading COVID-19? (Top 3 and Bottom 3 Responses)**

| Respondents rated each item on a 5-point scale, with "strongly disagree" worth 1 point and "strongly agree" worth 5 points. "Don't know" responses are excluded. | Lompoc Rating (N=113) | BOP-wide Rating (N=8,978) |
|---|---|---|
| Three Practices Rated Highest: | | |
| Staff are given sufficient information about COVID-19 symptoms and preventive actions (hand washing, wearing masks). | 3.86 | 4.09 |
| Inmates diagnosed with, or showing symptoms of, COVID-19 are being sufficiently segregated from other inmates to mitigate the virus spreading. | 3.75 | 3.94 |
| Inmates are given sufficient information about COVID-19 symptoms; preventive actions (e.g., hand washing, wearing masks); and changes to their daily routines. | 3.58 | 4.10 |
| Three Practices Rated Lowest: | | |
| Inmates are provided with a sufficient supply of masks. | 2.90 | 3.44 |
| Staff are provided a sufficient supply of masks. | 2.67 | 3.13 |
| Inmates are provided a sufficient supply of hand sanitizer where sinks are not available. | 2.48 | 3.07 |

**Please identify which, if any, of the following social distancing measures your institution is currently employing to increase the amount of space between staff and inmates. (Top 5 Responses)**

| | Lompoc Percent of Respondents (N=104) | BOP-wide Percent of Respondents (N=8,435) |
|---|---|---|
| The amount of time that inmates are required to remain in their housing units each day has been increased. | 51% | 55% |
| The number of inmates participating in a program or activity at one time has been reduced. | 24% | 42% |
| Other (Please describe.)* | 23% | 10% |
| I don't know. | 21% | 15% |
| Daily schedules are adjusted so that only one housing unit at a time is allowed to enter common space (such as the inmate cafeteria, Health Services clinic, library, classrooms, chapel, work space, or recreation space). | 20% | 44% |

Note: The majority of Lompoc respondents who answered "Other" reported that the lockdown implemented on April 20 was the institution's main social distancing strategy.

26

**Which of the following statements best describes the current guidance you have received from facility leadership about your use of personal protective equipment (PPE)? (Top 2 Responses)**



**Which of the following statements best describes the current approach to COVID-19 screening of existing inmates (temperature check, questioning about other symptoms) at your institution? (Top Response)**



*Note: Thirty-six percent of respondents chose "I don't know." The remaining chose categories amounting to less than 9 percent each.*

**Please identify which, if any, of the following COVID-19 measures for screening incoming and departing inmates (temperature check, questioning about other symptoms) your institution is currently taking. (Top 3 Responses)**



**Please identify which, if any, of the following measures your institution is currently employing to manage inmates with COVID-19 symptoms. (Top 3 Responses)**



**Please identify which, if any, of the following strategies your institution is currently employing to facilitate inmates' ability to communicate with family and friends outside the institution with whom they would normally interact. (Top 3 Responses)**

**Please identify which, if any, of the following strategies your institution is currently employing to facilitate inmates' ability to communicate with legal counsel. (Top 4 Responses)**





28

Case 3:16-cr-00034-JAG Document 44-1 Filed 12/23/20 Page 36 of 37 PageID# 316
Case 2:12-cr-00241-WBS-DB Document 128 Filed 10/27/21 Page 43 of 77

APPENDIX 3

# TIMELINE OF BOP GUIDANCE

**January**

**31** — **The BOP Issued Action Plan Phase One:**
- Identified the potential risk of exposure within BOP facilities and informed recipients about risk factors, symptoms to look for, and preventive measures.
- Recommended screening all new inmate arrivals to the BOP for COVID-19 risk factors and symptoms using a provided screening questionnaire.
- Recommended use of PPE for those in close contact with individuals who are suspected of being infected or individuals who have been diagnosed with COVID-19.

**February**

**29** — **The BOP Issued Updated Guidance for COVID-19 to BOP Medical Staff:**
- Recommended screening staff with potential risk factors and all new inmate arrivals using a screening questionnaire.
- Recommended conducting fit-testing for N95 respirators, disseminating information about proper PPE use, and establishing baseline supplies of PPE.
- Recommended establishing communication with local public health authorities, identifying possible quarantine areas, and alerting visitors that people with illnesses will not be allowed to visit.

**9** — The BOP issued screening and leave guidance for staff.

**11** — The World Health Organization declared COVID-19 a pandemic.

**March**

**13** — **The BOP Issued Action Plan Phase Two:**
- Suspended internal inmate movements for 30 days (exceptions for medical treatment and other exigencies) and legal visits (exceptions on a case-by-case basis), social visits, and volunteer visits.
- Canceled staff travel and training.
- Instructed institutions to assess inventories of food, medeons, cleaning supplies, and sanitation supplies.
- Required screening of staff (by self-reporting and temperature checks) "in areas with sustained community transmission" and all new BOP inmates and quarantining inmates where appropriate (those with exposure risk factors or symptoms).
- Required Wardens to modify operations to maximize social distancing, such as staggering meal and recreation times, for 30 days.

— The BOP issued a memorandum to Chief Executive Officers outlining necessary inmate mental health treatment and services during social distancing.

**18** — **The BOP Issued an Update to Action Plan Phase Two:**
- Stated that additional accommodations could be made for staff in high risk categories.

**The BOP Issued Action Plan Phase Three:**
- Provided guidance for non-institutional locations that perform administrative services.

**19** — The first two BOP staff were presumed positive for COVID-19.

**20** — The BOP issued guidance re-prioritizing outside medical and dental trips.

**21** — The first BOP inmate tested positive for COVID-19.

**23** — **The CDC issued Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities.**



**March (Cont'd)**

**-26-**

The BOP issued Action Plan Phase Four:
- Required all new inmates to be screened using a screening questionnaire and temperature check. If asymptomatic, inmates were to be quarantined for at least 14 days or until cleared by medical staff. If symptomatic, inmates were to remain in isolation until they tested negative for COVID-19 and were medically cleared.
- Required all inmates to be screened upon exiting the facility. Any symptomatic inmates were to be placed in isolation.
- Required all staff/contractors/other visitors to be screened upon entering the facility using screening questionnaire and temperature check.
- Required institutions to develop alternatives to in-person court appearances.
- Required all non-bargaining unit positions to comply with and participate in the respiratory protection program, including completing medical clearance, training, and fit-testing for N95 respirators.

**-28-**

The BOP issued an Update to Action Plan Phase Four:
- Required inmates transferring within the BOP, in addition to new inmates, to be screened upon arrival.

**-31-**

The BOP issued Action Plan Phase Five:
- Enacted a 14-day nationwide action, effective April 1, to minimize movement within BOP facilities.
- Emphasized continued and ongoing screening of all inmates to identify asymptomatic cases, and encourage early reporting by inmates of symptoms.
- Required prompt and thorough contact tracing investigations for symptomatic cases, quarantining close contacts of suspected or confirmed COVID-19 cases, and isolating any inmates with symptoms similar to COVID-19.
- Emphasized good hygiene and cleaning practices.
- Required institutions to limit staff movements to the areas to which they were assigned.
- Limited inmate movements to prevent group gatherings and maximized social distancing. Directed work details to continue with appropriate screening.
- Worked with the U.S. Marshals Service to limit inmate movements between institutions.
- Required all staff to be fit-tested for N95 respirators (included shaving all facial hair).
- Announced that UNICOR had initiated the manufacturing of face masks for inmates.

**April**

**-3-**

The BOP issued a memorandum directing Chief Executive Officers to: (1) establish a point of contact with local public health officials and local hospitals, if not already established, and (2) be responsive and transparent with outside stakeholders to demonstrate that the BOP is taking aggressive action to mitigate the spread of COVID-19.

The CDC issued new guidance recommending the use of cloth face coverings in addition to social distancing.

**-6-**

The BOP issued a memorandum to Chief Executive Officers indicating that it was working to issue face masks to all staff and inmates to lessen the spread of COVID-19 by asymptomatic or pre-symptomatic individuals.

**-7-**

The BOP issued a memorandum to Chief Executive Officers establishing that all inmates being released or transferred from a BOP facility into the community be placed in quarantine for 14 days prior to release.

**-13-**

The BOP issued Action Plan Phase Six:
- Extended guidance issued in Phase 5 through May 18.

**-24-**

The BOP expanded COVID-19 testing to include asymptomatic inmates following the acquisition of rapid ribonucleic acid testing equipment at select BOP facilities.

**May**

**-18-**

The BOP issued Action Plan Phase Seven:
- Extended guidance issued in Phase Six through June 30.

**June**

**-30-**

The BOP issued Action Plan Phase Eight:
- Extended guidance issued in Phase Seven through July 31.
- Established new procedures for in-person court trips and inmate movement between BOP institutions.
- Required COVID-19 testing of all incoming inmates.

**Source:** OIG analysis of documents provided by the BOP

30

EXHIBIT B
DR. HOMER VENTERS COVID-19
INSPECTION OF LOMPOC

COVID-19 Inspection of BOP Lompoc by Dr. Homer Venters

### A. Table of Contents

| | |
|---|---|
| Introduction | Page 1 |
| Methodology | Page 2 |
| Inspection | Page 4 |
| Findings | Page 18 |
| Summary | Page 28 |
| Appendix 1. Information reviewed | Page 31 |

### B. Introduction

1. This report is submitted to The Honorable Consuelo B. Marshall, United States District Court Judge, Central District of California in response to an order to perform a COVID-19 inspection of the Federal Bureau of Prisons facility Lompoc. This order relates to case CV 20-4450-CBM-(PVCx) *Torres et al. v. Milusnic et al.*

2. This facility inspection was ordered by The Court on August 12th, 2020.

3. The COVID-19 pandemic has caused over 100,000 documented cases of infection in U.S. prisons, including facilities of the U.S. Bureau of Prisons (BOP), since March 2020. The pace of this pandemic in U.S. prisons has increased in recent weeks after a slowing in June. In the BOP, over 13,000 cases were reported by September 1, 2020, with a case rate of 849 per 100,000 prisoners across all BOP facilities.[1] The rate and pace of infection has varied widely across the BOP system's 122 correctional facilities, with confirmed cases in 112 and a total number of infections of 1,752 federal inmates and 643 BOP staff, resulting in 118 prisoner and 2 staff deaths.[2]

---

[1] https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons, accessed 9/7/20.

[2] US BOP COVID Data. https://www.bop.gov/coronavirus/ accessed 9/5/20.

Venters-BOP Lompoc

4.  The COVID-19 outbreak at BOP Lompoc has been one of the nation's most overwhelming. BOP
    data on September 1, 2020, identified 953 detained people as 'recovered' from COVID-19 and
    three as actively infected. Four people were reported to have died from COVID-19 related illness.
    The census of the BOP Lompoc facility was approximately 2,200 at the time.

5.  In July 2020, the Office of the Inspector General of the U.S. Department of Justice released a
    report on the COVID-19 response at BOP Lompoc.[3] This remote inspection identified several
    areas of deficiency in the response, including inadequate staffing of health and correctional staff,
    lack of adequate testing and screening of detained people, inadequate leadership, shortage of
    personal protective equipment and extremely limited use of home confinement as an alternative
    for high-risk people.

**C.  Methodology**

6.  The goal of my inspection of BOP Lompoc was to assess the adequacy of the facility response to
    COVID-19. In order to achieve this goal, I relied on three basic questions;

    a.  Does the facility adequately identify and respond to individual cases of COVID-19?

    b.  Does the facility adequately implement infection control, social distancing and other
        measures to slow the spread of the virus?

    c.  Does the facility adequately identify and protect high-risk patients?

    These questions are interrelated in that all three domains are essential to an adequate COVID-19
    response and they rely on each other to be effective. Adequacy is determined using guidelines of
    the Centers for Disease Control and Prevention (CDC) relating to COVID-19 in detention settings

---

[3] DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL PANDEMIC RESPONSE REPORT 20-086 JULY
2020. https://oig.justice.gov/sites/default/files/reports/20-086.pdf?_ga=2.124398604.740363991.1599381764-
829252430.1596389882 accessed 9/13/20.

as well as basic correctional health standards.[4] Policies reported or produced by the Bureau of Prisons have also been utilized to assess adequacy, and many of the questions I posed to detained people and staff during the inspection were framed to elicit their understanding of the policies in place and whether/how they were being implemented. The adequacy of the BOP Lompoc response to COVID-19 is presented below in 'Findings' which includes strengths, deficiencies and recommendations.

7. Communication regarding the information I required to conduct this inspection, as well as the timing and logistics of the inspection included attorneys from both respondents and plaintiffs. My actual inspection occurred on September 1st and 2nd 2020. During the inspection, I posed multiple questions about information that the BOP/PHS team indicated they would best be able to respond to in writing. I submitted a list of these questions after my inspection and the information was produced to me between September 7th and September 24th 2020. The list of information I reviewed for this report is contained below in Appendix 1.

8. Physical inspection of BOP Lompoc was conducted with facility leadership and staff and without attorneys for either the respondents or plaintiffs. Facility staff took photographs of areas I requested and produced them afterwards on a secure platform, along with responses to questions that arose during the inspection that required verification, and supplemental communication from detained people who I was unable to speak with due to time constraints.

9. During the inspection, BOP Lompoc staff did not block or impede my access to any part of the facility and were extremely helpful in orienting me to the overall layout and operations of the facility, the various measures taken in response to COVID-19 and the current status of COVID-19 mitigation efforts.

---

[4] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. Updated July 22, 2020. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/index.html, accessed 9/13/20.

3

Venters-BOP Lompoc

**D. Inspection**

10. The Lompoc inspection was conducted over two days, September 1st and 2nd. The BOP Lompoc

complex is comprised of three administrative areas, FCI Lompoc, also referred to as 'the Low'

because of its low security status, USP Lompoc, also referred to as 'the Medium', for the same

reason, and two camp areas, North and South Camps. The first day of inspection focused on FCI

Lompoc (the Low) and the second on USP Lompoc (the Medium) and the two camp areas.

During this time, I spoke with 52 detained people and approximately 25 staff members. In most

housing areas, there were many more people seeking to speak about their COVID-19 experiences

than time allowed for. BOP staff and I agreed that people who I did not have time to speak with

could submit written information that would be provided to me. I received four such written

communications. In each facility, I was accompanied by a BOP/PHS team that included one or

more leadership and staff from the specific facility as well as a Public Health Service Officer who

provided information on the overall COVID-19 response and how each facility implemented BOP

COVID-19 policies and a BOP who took photos and notes. The facility Warden and Heath

Service Administrator were present intermittently during the inspection.

11. The first area of inspection was the staff screening process, located at the facility training center.

The BOP/PHS team indicated that every staff member was screened daily at this site before

starting work. The screening area was a large lobby and followed a L-shaped path that was

approximately 40 feet on each side, with two primary stops, one for temperature screening and

one for symptom screening. A final check with security occurred with a wrist band being given

for anyone who cleared screening, and the wrist bands were different colors for the two days of

my inspection. Written record of each individual screening was created.

12. The first facility with detained people that I inspected was FCI Lompoc also referred to as 'the

Low'. The BOP/PHS team indicated that 1020 people were detained at the time of my inspection,

and that no medical isolation or medical quarantine was being conducted in this facility. The

BOP/PHS team stated that three detained people were in medical isolation for COVID-19 and

4

that two or three staff were currently diagnosed with COVID-19. I was also told that new admissions to the overall complex had restarted, and that the new admission quarantine process, like other quarantine and medical isolation, occurred at USP Lompoc/the Medium. Before starting the inspection, I went through the fit testing process for N95 mask use. The officer who performed the fit testing closely followed the written prompts and script in his possession and the equipment and supplies he utilized were clean and it only took a few minutes for him to bring them to a room in the facility to perform the test. His supervisor indicated that all staff, security and health, were fit tested for N95 mask use.

13. Prior to inspecting housing areas, I asked the BOP/PHS team how many high-risk patients were in this facility and the overall complex and they stated that this information was tracked on a COVID-19 spreadsheet that would be provided to me but that they were not certain about exact numbers or proportions. I then asked how many people who had been diagnosed with COVID-19 had ongoing or lingering symptoms after their medical isolation was complete. The staff stated that no patients had any symptoms that persisted from COVID-19 infection. When I clarified that I was asking about symptoms that persist for weeks or months after the initial infection, the staff again stated that no patients have any such symptoms. I asked whether there is a standard assessment conducted in the week or two after medical isolation release to look for ongoing symptoms, disability or other medical problems and was told that no such process exists but that existing sick call would allow for anyone to be seen within one day for any such concerns. The BOP/PHS team also indicated that all officers wear masks and ensure social distancing, but they also stated that no tracking or documentation of these tasks exists in unit logbooks or supervisor records. I was told that both mask wearing by officers and social distancing are ensured through periodic rounding by supervisors. Data supplied by the BOP/PHS team after my inspection indicates that 525 of the 1020 people detained in the Low (51.6%) meet CDC criteria for being high-risk for serious illness to death from COVID-19 infection.

5

14. I asked about the use of daily COVID-19 screenings similar to what was done for staff, and the

BOP/PHS team indicated that housing area screenings were only conducted in quarantine and

medical isolation settings, not for housing areas without either designation. They stated that in the

Low, this meant that no housing areas, including the one dorm area for people who have never

tested positive for COVID-19 (J dorm), have daily screening for COVID-19. I was also told by

the BOP/PHS team that any detained person who works outside their cohort or housing area is

screened on daily basis by being asked questions about current symptoms of COVID-19. This

process of screening every detained person who works across the various Lompoc sites, including

the farm and other work areas, was repeatedly presented to me as a process that occurs without

fail, and that security staff ask these questions before any detainee starts their work on a daily

basis. I asked about training materials for this process and was told that none exist. I asked about

logbook entries or other documentation that these screenings occur and was told that none exist.

15. I inspected the education area which did not have any detained people present, and was informed

by the BOP/PHS team that if any person was suspected of having COVID-19 while in this or any

other area, a 'Strike team' would be called to conduct high level cleaning and disinfection. This

included BOP staff who work in the safety department and detained people who have additional

training for responding to suspected COVID-19 cases as well as additional PPE, although they

indicated that while staff have access to N95 masks, the detained people on the strike team would

not have N95 masks.

16. I next inspected building B which includes several housing areas (Photos DSC 1-12). I first

inspected housing area E, which the BOP/PHS team reported as housing 164 people with a

capacity for 234. The BOP/PHS team explained that people in this housing area utilize a central

dining hall that is cleaned by the aforementioned Strike team in between uses. They also

explained that no sick call encounters occur in or on the unit and that people would submit paper

requests for sick call and be seen at the medical clinic. They also confirmed that everyone in this

housing area and the other housing areas, except for J dorm, had tested positive for COVID-19. I

then inspected housing area D. Both housing areas are comprised of open bunks are present with bathrooms situated in between bunk areas. At the time of my inspection, most detained people and staff were wearing masks. The bunks in the sleeping areas were situated close together, approximately 5-6 feet apart, with both top and bottom bunks in use intermittently. Some bunks were arranged head to toe, either for adjacent bunks or top/bottom bunks, and some were not Floors of all areas were clean, without trash or debris. Fewer than half of bathrooms had paper towels available at the time of my inspection. All bathrooms had soap available.

17. The next area I inspected was the food service area (photos DSC 13-15). The tables in this area had tape on every other seat to indicate where people should not sit. The BOP/PHS team presented these seating arrangements as part of their efforts to promote social distancing. The tape appeared to be freshly applied.

18. I subsequently inspected the Gym area of the Low (photos DSC 0017-0028), which the BOP/PHS team explained served as a housing area for approximately 25 high-risk patients in August. The sequence of events that led to placing high-risk patients into the gym involved testing in early May which identified most people as COVID-19 positive, and the small number of COVID-19 negative people were placed into building M and then building J. At some point in August, several of the people in building J building developed COVID-19 symptoms and part of the response included placing 20-25 high-risk people into the gym to keep them separate from other detained people for approximately 25 days. The gym was not in use at the time of my inspection. The shower in the gym is located inside a mop or utility closet, which is not clear from the photos.

19. The next area I inspected in the Low was J dorm, which was at approximately 2/3 capacity. This dorm was similar to the E building in terms of the bunk placement as well as the intermittent use of both top and bottom bunks and the lack of any consistency to the head to toe arrangement of adjacent or top/bottom bunks. As with E building, one of two bathrooms I inspected in J building

7

had paper towels in the dispenser. Most detained people and staff were wearing masks as the time

of my inspection and the floors in sleeping areas and bathrooms were clean and free of debris.

20. I spoke with 20 detained people in the Low and received written communication from another

two. The following are COVID-19 concerns or observations that were relayed by at least two of

the people I spoke with.

    a.  People who receive daily medications reported that they line up in very close fashion,

       often touching the person in front of and behind them. They explained that because they

       do not control the movement of others, and because they don't want to miss their

       medication, they are unable to get others to space out. Nobody had ever seen a

       correctional officer ask or tell detained people to spread out or mention social distancing

       while waiting for medications.

    b.  People I spoke with reported that sick call requests often go unanswered and when they

       are seen, it is most often more than a week after reporting a medical problem. Many

       people also reported submitting multiple sick call requests over several weeks without

       being seen for the same ongoing health problem.

    c.  People who were held in 'the hospital' for medical isolation reported being seen and

       assessed on a daily basis, but many of those who held in other medical isolation settings

       reported going days in between clinical assessments. Multiple people also reported that

       daily COVID-19 screenings in quarantine units were often limited to temperature checks

       without being asked about their symptoms.

    d.  All of the people I spoke with in the Low had COVID-19 in the weeks or months before

       my visit. Approximately 1/4 of them were still experiencing symptoms of COVID-19,

       including shortness of breath, pain with breathing, daily headaches, ringing in the ears

       and weakness. None of them reported being seen after leaving medical isolation to be

       asked about ongoing COVID-19 symptoms or disability. Most of those who reported

       ongoing symptoms of COVID-19 stated that they had submitted multiple sick call

requests without eliciting any response. As one person stated "I stopped putting in cop-
outs because they told me it was just part of the COVID."

e. In units that had paper towels, detained people stated that the paper towels were made
available in the days before my inspection. Posting of new COVID-19 signage and
general cleaning was also reportedly done just before the inspection.

f. Many of the people who reported having COVID-19 symptoms as the reason for being
tested (as opposed to being tested in response to another case) reported being initially
rebuffed by medical staff, being told that they had a cold, the flu or that they needed to
'wait and see' before being evaluated by a physician or tested. These people reported
writing their COVID-19 symptoms on sick call slips and sometimes reporting to nursing
staff during medication administration. They often reported receiving Tylenol and being
returned to their housing area if they reported multiple COVID-19 symptoms but did not
have a fever.

g. Many people who told me that they were not ill at the time of their COVID-19 test
reported that they had actually been sick weeks earlier. They expressed concerns that
their medical records document them as asymptomatic and/or recovered, but that they
had been very ill before their tests and either faced barriers to accessing testing and care
or were reluctant to report being sick because they didn't want to go into a solitary
confinement setting.

h. Many patients with chronic health problems, including hypertension, diabetes and asthma
reported that they went many months, often more than 6, without being seen in the
chronic care clinic. They stated that their medications would be renewed many times and
even when having worsening symptoms of their disease, they could not be seen for
chronic care issues. People with hypertension stated that their blood pressure was
generally not checked in between chronic care visits, so that they went many months
without knowing their blood pressure, and people with asthma reported that their peak

flow measurement was not checked, either during chronic care visits or during asthma attacks. Most of the people with chronic care issues I spoke with reported that they had not had a chronic care encounter since contracting COVID-19. Most of the people I spoke with about chronic care stated that they believed that insufficient staffing caused delays in their chronic care.

i. I spoke with three people who used canes or walkers and each of them expressed difficulty in the COVID-19 response, including the inability to use the shower in the gym, when housed there, as well as the need to navigate stairs to receive medications and go to meals.

j. Many of the people I spoke with who were in medical isolation during the months of April, May and June reported that they were not examined regularly and that they went days in between a health professional physically examining their lungs or doing any assessment other than a temperature check. One man who reported that his COVID-19 symptoms included elevated heart rate, palpitations and shortness of breath reported that nobody ever listened to his lungs with a stethoscope while in medical isolation and that he was never given an EKG despite his heart rate being very elevated on the day he entered medical isolation. People who experienced medical isolation in the 'hospital' reported more regular daily assessments and access to care, while those who experienced medical isolation in various prison housing units more consistently reported barriers to assessment and care.

k. Several of the people I spoke with reported that officer wearing of masks is inconsistent, with less compliance on night and weekend shifts.

21. The next area I inspected was the North and South Camp (photos DSC 29-38). I was told by the BOP/PHS team that most of the workers for the farm, transportation, safety, food service and Air Force base were housed in the Camps. The BOP/PHS team repeated their explanation from the prior day that every detained worker was screened for COVID-19 symptoms on a daily basis

before starting work. I was told that some of these work assignments had been suspended during

earlier COVID-19 response, but that most had restarted and that all would be functioning soon. I

asked about documentation that the worker screening process occurred, as is the case in the staff

screening area, and was told that the screenings happen without fail, but that there was no

documentation. I asked about high heat days (housing area temperatures greater than 87'f) and

heat sensitivity for people with chronic health problems, and the potential interaction between

heat stress/stroke and COVID-19 in these groups of people, and was told that BOP Lompoc does

not experience any high heat days. The North Camp was reported to have one dorm, with 101

people currently housed, and the South Camp, two dorms with a total of 185 people, and both

camps at approximately 50% overall capacity.

22. These dorms were large open areas, each with capacity for 160-190 people. In the middle of the

North Camp dorm, a computer/phone area was present with a bottle of cleaning or disinfecting

spray present at every terminal or phone. The living spaces and bathrooms were clean of debris

on the floor and the individual some bunks were arranged head to toe to the closest bunk and

others were not. Every bunk in the North Camp had a bottle of cleaning solution hanging from the

frame.

23. After the North Camp dorm, I inspected the programs area, which was not being utilized at the

time. After inspecting the South Camp dorms, I inspected the dining hall. This area was utilized

for housing of detained people and multiple detained people reported to me that this dining hall

had been closed prior to COVID-19 due to mold or other health issues. The BOP/PHS team stated

that the dining hall had been closed for renovations and in the response to my request for any

documentation of mold or other health risks in this dining hall, the BOP stated that they had no

records of any such concern.

24. I then inspected the medical clinic where sick call and chronic care encounters for both Camps

occur. The clinic included several examination rooms and a pharmacy window that was presented

as the spot where people que to receive their medications. The Health Services Administrator

11

(HSA) explained that both Camps were transitioning to a sick call box system that would not
require people to physically come to the clinic to submit their sick call requests. I asked about
what level of staffing was dedicated to this facility, for MD, mid-level (PA or NP) and nursing
staff and was told that no set staffing level existed but that staff spent whatever time was needed
to see patients. I asked of there was an average number of hours per day that nurses and other
health staff were in the clinic and was told that this varies and could not be estimated. I asked
about expectations for sick call response time and the HSA stated that if anyone reported a new
injury or pain or any medical problem relating to a chronic care exacerbation, that they would be
seen within 24 hours, not only in the Camps but throughout BOP Lompoc. I asked how sick call
timeliness was monitored, including the subset of sick call requests that involve COVID-19
symptoms and was told that this is not a metric that is tracked.

25. I spoke with 22 detained people in the North and South Camps. The following are COVID-19
concerns or observations that were relayed by at least two of the people I spoke with.

   a. As in the Low, most people I spoke with in the North and South Camps reported that sick
      call requests take more than a week for response and most of the chronic care patients I
      spoke with expressed frustration that they were not seen regularly. Many of the chronic
      care patients stated that it had been more than six months since they had been seen and
      that they were unable to get a response via sick call or chronic care when their disease
      symptoms worsened. I spoke with three people who had been injured in their work or in
      the housing area and who reported more than two weeks in response to sick call
      encounters for their injuries.

   b. People I spoke with in the Camps reported having COVID-19 in the weeks or months
      before my visit and approximately ¼ of them reported still experiencing symptoms of
      COVID-19, including pain with breathing, headaches, loss of taste and smell, joint
      stiffness and weakness. None of them reported being seen after leaving medical isolation

12

to be asked about ongoing COVID-19 symptoms or disability and several reported that they had submitted multiple sick call requests for these symptoms without being seen.

c.  Other reports from people in the Camps that echoed what people reported in the Low included the difficult initially accessing care when they became ill with COVID-19, as well as concerns about having been labelled asymptomatic when they tested positive despite actually being ill with COVID-19 weeks earlier. Multiple people also reported that daily COVID-19 screenings in quarantine units were often limited to temperature checks without being asked about their symptoms.

d.  Several people also expressed feeling reluctance to report their COVID-19 symptoms when they first became ill because the unit they would be transferred to was operated like solitary confinement.

e.  I asked people in the Camps about their work detail and whether they are screened on a daily basis for COVID-19 symptoms. Nobody reported ever having been screened as part of their work detail.

f.  Many of the people I spoke with in the Camps reported that officers regularly do not wear masks, including the count officers who rotate between units. None of the people I asked about medication lines reported any efforts to implement or promote social distancing while in the medication or clinic ques.

g.  Several people in the Camps reported intimidation from correctional officers before my inspection, including outright threats to not speak with me as well as threats of solitary confinement if masks were specifically not worn during the inspection. As with the Low, in areas with paper towels, detained people stated that the paper towels and soap were made available in the days before my inspection.

26. The next area of my BOP Lompoc inspection was the USP (United States Penitentiary) also known as 'the Medium'. I spoke with 10 people detained in this facility and toured housing areas as well as the dedicated COVID-19 inpatient unit referred to by detained people as 'the hospital'.

13

The BOP/PHS team included facility and complex leadership and I was able to speak with the
lead physician (Clinical Director) as well as the HSA during parts of this inspection. The Medium
was presented as two administrative areas, the general population area, which housed 702 people
at the time of my inspection and the special housing unit, or 'SHU' which housed 205 people.
The first area of my inspection was the inpatient unit also referred by detained people as 'the
hospital'. This structure was created by completely renovating an existing space to fashion a new
12 room medical care unit with a central nursing station and surrounding rooms for patient care.
This unit provided patient care between May 15 and August 31, according to the BOP/PHS team.
The team stated that COVID-19 patients who required some combination of elevated medical
monitoring, intravenous fluids and oxygen therapy were treated in this unit. The staff who
provided this care were from a contract with an outside vendor, Unicor. At the time I inspected
this unit, the staff were decommissioning the unit because no patients were housed there. The
BOP/PHS team presented to me that there was no plan to utilize this unit in the coming weeks
and that additional staffing resources would be required to do so.

27. The next area I inspected was the J unit, which was reported by the BOP/PHS team to have 119
people, and a capacity of 242 (photos DSC 39-45). The B range of the J unit was comprised of
individual cells and a dedicated shower area. The common areas of the floors were clean of debris
as were the shower areas. The BOP/PHS team indicated that most of the people on this unit were
in single cells, and that anyone designated as 'high-risk' based on CDC criteria was in a single
cell.

28. The next area I inspected was the facility intake unit (photos DSC 49-60). The BOP/PHS team
explained that new admissions to anywhere in the BOP Lompoc facility would be processed in
this unit and then proceed to new admission quarantine, also in the Medium, before going to their
eventual housing area. The team stated that every cell would be cleaned in between intakes, so
that each group of new admissions would be processed through and the cells they had been in
cleaned, before another group was processed. The cleaning of these cells was done by detained

14

people. When I asked whether people doing this cleaning were screened for symptoms of COVID-19 at the start of their shift, the housing area officers did not appear to be familiar with this process and the leadership interjected to say that this screening was done without fail. I asked whether the cleaning of the cells or the screening of the cleaning workers was documented in a logbook or elsewhere and was told that neither task was recorded.

29. The next area I inspected was the SHU, comprised of 6 tiers (photos DSC 61-64). Three of the tiers were in use as quarantine, presented by the team as housing quarantined people who were awaiting transfer to another facility or who were in a 'special population'. These tiers were all comprised of cells with solid doors and the BOP/PHS team stated that whenever a food slot or doon on a cell is opened, staff don PPE. The team stated that all quarantine patients are in single cells and that none of them has access to recreation or telephone. The team also stated that at least daily, a temperature check and COVID-19 symptom screening is conducted for all detainees, usually by opening the food slot.

30. The next two areas I inspected were housing areas utilized for pre-release quarantine and medical isolation. Both areas were comprised of open bar-stock units. The BOP/PHS team described the current approach to movement in and out of the facility as a 'test in, test out' model in which any newly admitted person, or person set to be released would be tested twice and proceed on their path with two negative test results. People with positive tests would be transferred to medical isolation for further assessments. In the pre-release unit, the donning and doffing of PPE was set up inside the unit, near the entrance (photo DSC 0064). In the nearby housing area utilized for medical isolation, three patients were being housed as a result of active COVID-19 concerns. A purpose-built enclosure was set up outside this unit for doffing of PPE.

31. I also inspected the medical clinic area, and was able to see the examination rooms and speak to the Clinical Director and Health Service Administrator. During this discussion I asked both leaders as well as the rest of the BOP/PHS team whether the facility has a quality assurance metric that tracks timeliness with sick call requests and reports to the quarterly or monthly quality

15

meetings what this tracking reveals. I asked the same question in relation to the percentage of

chronic care visits that occur within prescribed timelines. I was told that there was no such

tracking or reporting of either chronic care or sick call timeliness. The Clinical Director stated

that he was certain that 100% of chronic care encounters occur within the prescribed timeframe

based on BOP guidelines because there is a roster of chronic care encounters and he has access to

this information. I then asked how the impact of staffing shortages is assessed in relation to the

ability to perform sick call and chronic care encounters. The team was either unable or unwilling

to identify any relationship between staffing levels and lack of timely response to sick call or

chronic care. I inquired how the need for staffing was tracked in relation to the availability of

staffing hours for nurses and physicians and the HSA indicated that staff were used when needed,

but that there was no set matrix or number of staff hours in any of the various clinics because the

needs would change from day to day. I further inquired whether an average or median number of

hours needed was tracked and received the same reply, that staffing was allotted as needed but

that neither the HSA nor the Clinical Director would offer an opinion about how currently

unfilled lines relate to access to care.

32. During my time in USP/the Medium, I spoke with ten detained people across the housing areas

that I inspected. The following represent COVID-19 related issues or concerns that at least two

people reported to me;

    a. At with the prior facilities, detained people reported that sick call requests regarding

       medical problems often go unanswered or that more than a week passes between

       submitting and being seen.

    b. Multiple people in the USP reported that they do not have access to paper towels and

       must use personal towels for drying their hands after washing and that these towels are

       generally wet much of the time because they are used for cleaning their cells as well as

       personal hygiene.

Venters-BOP Lompoc

    c.  Patients I spoke with in the chronic care services reported that they go many months in between encounters, some reporting more than six months since being seen. Several people reported that even when their chronic health problems worsen, they may not be able to be seen. Some chronic care patients reported that filing a grievance may prompt being seen for either sick call or chronic care, but that this also brings the risk of retaliation by security staff.

    d.  Two people reported that their medical isolation time had been extended by approximately one week when their test results were lost.

    e.  Several people reported that officers in their units do not wear masks, especially on night and weekend shifts.

    f.  Among patients who had tested positive for COVID-19, several reported ongoing symptoms of COVID-19 including weakness and headaches. Some also reported that they had been ill months before being tested and that they were concerned that their medical records document them as asymptomatic, even though they were ill with symptoms when originally infected.

    g.  Threats from officers for speaking candidly with me were also reported in these discussions.

33. Across the three facilities I inspected, several people reported that cleaning of common areas is not conducted regularly and that when a potential COVID-19 case is identified, no special measures are taken in cleaning/disinfecting of the personal effects and living space of that person. These reports included either observing no cleaning/disinfecting at all, or having detained people without masks engage in cleaning/disinfecting when a potential COVID-19 case has been identified.

34. My review individual patient medical records, chronic care rosters and BOP mortality reviews reveals several concerns;

  a. Multiple patients who died from COVID-19 appear not to have received regular or timely medical assessment *after* being identified as ill with COVID-19. This concern includes lack of a daily health assessment while a patient has active COVID-19 symptoms so that more than 24 hours passed between documentation of worsening clinical status and the next encounter, resulting in the terminal hospitalization.

  b. Access to chronic care encounters appears to occur at less frequent intervals than described by facility leadership, and reference is made to 'annual' chronic care encounters, including attempting to address up to six chronic diseases in such an encounter with very limited physical assessment.

  c. All four of the internal mortality reviews note multiple strengths in the clinical care received by patients who died from COVID-19 and zero suggestions or recommendations for any improvement. Each of these reviews is accompanied by a one-page external consultant review that also notes no recommendations or suggestions to improve care for any of these cases.

## E. Findings

35. My findings are divided into three areas; strengths deficiencies and recommendations. My framework for evaluation is based on how the facility has responded to three areas of COVID-19 response;

  a. Does the facility adequately identify and respond to individual cases of COVID-19? This area of response includes screening for new cases, response to sick call requests relating to COVID-19, as well as the practices in medical isolation once cases are identified and identification and treatment of persisting COVID-19 symptoms.

  b. Does the facility adequately slow the spread of the COVID-19 virus? This area of response includes basic infection control including hand washing and drying, cleaning of common areas, social distancing and mask wearing.

18

Venters-BOP Lompoc

    c.   Does the facility adequately identify and protect high-risk patients? This area of response includes the use of the chronic care program and enhanced screening and infection control measures to identify, educate and care for patients before, during and after COVID-19 infection based on their increased risk of death and serious illness. This also includes efforts to secure release for high-risk patients from detention.

36. Strengths of the BOP/Lompoc COVID-19 response.

    a.   Staff screening. The staff intake screening process located in the training center is very well-organized and includes adequate space so that staff do not bunch up during screenings, as well as paper records of each screening. Use of a single, non-custodial site allows the facility to ensure that anyone who has an elevated temperature or who has positive responses to screening questions will not proceed into a facility.

    b.   Hospital unit. One very clear strength of the BOP Lompoc response was the creation of a dedicated unit to care for COVID-19 patients. This unit is superior to any other effort I have seen in my 12 facility COVID-19 inspections and clearly provided a higher level of care to the relatively small number of patients who were treated there. Because this unit was designed with health care delivery as the main priority, the physical plant and systems of information and care utilized ensured that patients were regularly assessed, and that when patients showed clinical worsening, staff were quickly aware and followed clear protocols concerning additional care and hospital transfer. This unit lies fallow now, reportedly because of a lack of dedicated staff and also because of an unclear clinical need.

    c.   Screening database. The BOP/PHS team stated that they originally created a spreadsheet or tracking document to include symptoms of COVID-19 that were detected either through daily screenings in quarantine units or through sick call reports. This approach is very important because it gives the facility the ability to track the occurrence of new COVID-19 symptoms across time and location. This approach is particularly critical as a

19

management tool in the coming months because of the impending influenza season, the restarting of new admissions and the fact that many of those originally infected are passing their 90-day mark, potentially vulnerable to a second infection.

d.  Testing. BOP Lompoc has significantly expanded COVID-19 testing in coordination with national BOP protocols. Key elements of this approach include testing of all potential close contacts when a new case of COVDI-19 is detected as well as a 'test-in, test-out' approach which is now relatively standard in prison systems. This approach involves housing newly detained people in a quarantine unit where they are offered two COVID-19 tests, one near the start and a second near the end of their 14-day quarantine. A similar process is utilized for people awaiting transfer out of the facility.

e.  Quarterly quality meetings. I reviewed the quarterly quality report entitled '"Improving Organizational Performance Meeting" and find that many crucial principles of quality assurance and improvement are being utilized in BOP Lompoc. A quality improvement project on promoting adequate hand hygiene involved clear outline of goals, metrics and outcomes in the analysis of 15 health staff per month and tracked the percentage that performed proper hand hygiene. Other strengths of this report include data reporting in medication errors, dental and cancer screenings.

f.  PHS involvement. The PHS Officer who accompanied me during the inspection was extremely knowledgeable about every aspect of the facility COVID-19 policies and responses despite having a role that oversees multiple BOP facilities. Gaps in the implementation of those policies (below) reflect a lack of staffing and information systems, but the presence of a highly trained and engaged PHS Officer is a tremendous asset to the facility and COVID-19 patients alike.

g.  Housing area cleanliness and cleaning solutions. The housing areas were generally clean and free of debris during my inspection, in both living quarters and bathrooms. Cleaning solution for personal spaces also appeared abundant during the time of my inspection.

Venters-BOP Lompoc

37. Deficiencies in the BOP/Lompoc COVID-19 response.

   a. COVID-19 screening. Several deficiencies exist in the BOP Lompoc approach to
   COVID-19 screening among detained people. Taken together, these screening
   deficiencies increase the risk that patients will become seriously ill or die from COVID-
   19 and also increase the potential spread of the virus.

        i. The most obvious screening issue is that the facility is not conducting daily
        COVID-19 screenings among the people who have not yet had COVID-19. The
        current approach of only utilizing daily screenings among staff and detainees in
        quarantine units leave the facility vulnerable to development of COVID-19
        among people who are naïve to COVID-19. The problems with sick call (below)
        increase the consequences that may flow this lack of screening.

        ii. A second deficiency in the screening process involves detained people in work
        details. During both days of my inspection, the entire BOP/PHS team stated that
        every detained person who works outside their housing area is screened daily for
        COVID-19 symptoms before they start work. I asked whether any record of these
        screenings occurring exists, either in logbooks utilized by staff or elsewhere. I
        was told that there was no such documentation that these daily screenings occur,
        but that the leadership of the facility, including the PHS officer, were certain that
        these screenings occur. I spoke with numerous detained people who work outside
        their housing area, many of them in the North or South Camps, and none of them
        reported having ever been screened before work. In addition, when I asked
        individual officers about how this process occurs, in housing areas as well as in
        various areas of the facility where work might occur, none of them seemed
        familiar with the process. This is a critical deficiency because aside from staff,
        the work details are the primary potential vector for spread of COVID-19 from
        one part of the facility to another.

21

Venters-BOP Lompoc

    iii. A third screening concern is that many of the medical records I examined show inconsistent screening activities, meaning that some of the people who became ill with COVID-19 and even died from COVID-19 had screenings documented less than daily while in a quarantine or medical isolation units. I reviewed 140 pages of screening records and it is clear that despite the stated policies of BOP/PHS to screen for both temperature and symptoms, only temperatures are being recorded much of the time, which was also reported as the practice by many detained people. This reliance on elevated temperature alone is an unreliable approach to detecting COVID-19.[5]

b. Lack of timely access to sick call and chronic care. Among the 52 people I spoke with, the most common COVID-19 related concern was a lack of access to health care, namely sick call and chronic care encounters. These encounters and care are central to the facility COVID-19 response. Detained people overwhelmingly attributed these concerns to a lack of staffing in the health service.

    i. Sick call timeliness was reported by almost every person to exceed stated expectations. The BOP/PHS team indicated that a sick call requests concerning a new health problem that included a symptom such as pain should result in a face to face encounter within 24 hours. This is consistent with correctional standards of care.[6] People I spoke with consistently reported that reports of new pain, injury and other new medical problems routinely took more than a week to result in being seen, and often that multiple sick call requests and even grievances were

---

[5] Voytco L. Fauci Says Coronavirus Temperature Checks 'Notoriously Inaccurate'. Forbes Online. Aug 13, 2020. https://www.forbes.com/sites/lisettevoytko/2020/08/13/fauci-says-coronavirus-temperature-checks-notoriously-inaccurate/#4324213e33f0, accessed 9/15/20.
[6] National Commission on Correctional Health Care https://www.ncchc.org/cnp-screening-sickcall-triage, accessed 9/17/20.

required to elicit a response. Several people reported that they initially reported
COVID-19 symptoms via sick call and that they were not seen for days or longer.

ii.  Chronic care encounters were also reported by almost all people in the chronic
care service to take far longer than the 3-6-month window referenced by BOP
staff. These delays were also clear when I reviewed the chronic care roster
referenced by the Clinical Director, but this information is not part of regular
quality assurance. These delays in chronic care can significantly increase the risk
of serious illness or death from COVID-19 since poorly controlled health
problems are associated with worse COVID-19 outcomes. For example, several
patients with asthma stated to me that despite reporting asthma exacerbations via
sick call, they continued to receive the same medications and no chronic care
encounters for many months. I also reviewed utilization data which showed that
184 chronic care encounters occurred in the month of August 2020. The facility
separately reported that a total of 1134 detained people qualify as being high risk
for serious illness or death from COVID-19, 50.8 % of the total population.
Based on assumptions shared by staff, that most of those people are on the
chronic care service and that there is a range of time intervals between 1 and 6
months for chronic care encounters, this monthly pace of chronic care encounters
falls far below what is needed.[7]

iii. A separate access to care issue is the lack of assessment for ongoing COVID-19
symptoms among people who have survived the infection. I spoke with many
people who reported ongoing shortness of breath, pain, headaches, weakness and
ringing in the ears weeks after their initial infection. The presence of these

---

[7] Assuming 1000 of the high-risk people are on the chronic care service, with a 50/30/20 % split for 6/3/1-month
intervals, a monthly pace of 383 chronic care encounters is needed. This need is even greater if there are ever
interruptions in services or if patients have more than one chronic care problem and not all problems are
addressed at each visit, which medical records show to be the case at least some of the time.

23

ongoing symptoms and even disability among a group of people who are classified by BOP as 'recovered' reveals a lack of any system to look for these problems after a person leaves medical isolation. BOP has an obligation to assess COVID-19 patients and care for those who require physical therapy, specialty referral and other types of care during recovery.

c. Lack of infection control in housing areas. Throughout the facilities I inspected, it was clear that people either had no access to paper towels or that access had been provided in the days before my inspection. The CDC has clearly identified the ability to dry one's hands with a single use paper towel or air dryer as critical to COVID-19 response.[8] In one housing area I was told by BOP leadership that paper towels were not needed because of the presence of a hand dryer. I tested the hand dryer and it was broken. Staff and detained people in the unit confirmed that it had not worked for over one year. I have inspected numerous facilities that manage to secure paper towels for people in both dorm and cell housing areas.

Throughout my inspection, the BOP/PHS team stated that common surfaces are cleaned and disinfected at least two times per day and the BOP supplied a COVID-19 cleaning policy which affirms the same. I reviewed data from the Truintel system, which serves as an electronic logbook, and where BOP staff stated that every round of cleaning/disinfecting is recorded. In the four 24-hour periods I reviewed (2 each for North and South Camp), only one was cleaned twice, the others only once. This is consistent with reports from detained people that cleaning/disinfecting does not occur according to facility policies.

Despite BOP/PHS assurances that enhanced cleaning occurs in any response to a suspected COVID-19 case via a 'Strike team', multiple detained people reported that

---

[8] COVID-19: Handwashing. https://www.cdc.gov/coronavirus/2019-ncov/global-covid-19/handwashing.html, accessed on 9/21/20.

after identification of a potential COVID-19 case, personal effects and spaces were either left exposed without any cleaning/disinfecting or that detained people without masks were used to conduct this high-risk work.

d. Punitive approach to quarantine. The SHU unit I inspected is a 6-tier housing area designed for punitive segregation. The housing of people for 22-24 hours per day in cells, without access to basic privileges including phone and out of cell time is not appropriate and runs counter to CDC guidelines on making COVID-19 responses in detention settings non-punitive.[9] While not directly related to quarantine, the intimidation and threatening of detained people to behave in a manner prescribed by correctional staff during the inspection is another very concerning example of a punitive response to the COVID-19 outbreak in the facility.

38. Recommendations to mitigate morbidity and mortality from COVID-19 at BOP Lompoc.

Recommendation 1. All detained people in BOP Lompoc should be screened for both elevated temperature and COVID-19 symptoms on a daily basis, prioritizing rollout among people in work crews, those who are COVID-19 negative and those who are >90 days post-infection.[10] Results of screenings should be entered into patient records and health leadership should review an adequate sample of screenings on a monthly basis to know that they occur and are recorded. BOP/PHS should also restart their daily tracking of COVID-19 symptoms reported either through sick call or screenings, both as an outbreak management tool and quality assurance intervention. All screening results and sick call requests should be entered into patient records.

Recommendation 2. BOP Lompoc should identify the number of additional health staff required to meet their sick call and chronic care obligations and hire those staff within 30 days. BOP

---

[9] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities Updated July 22, 2020. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html, accessed 9/19/20.

[10] The CDC has reported immunity from COVID-19 reinfection as potentially limited to 90 days. https://www.cdc.gov/media/releases/2020/s0814-updated-isolation-guidance.html, accessed 9/15/20.

25

documents indicate that among its roster of 35 health staff, there are ten staffing vacancies, including one medical officer, two nurse practitioners, one nurse, one pharmacist and two paramedics. The PHS roster of four lines includes two vacancies, a quality improvement coordinator and a physician assistant. In addition to regular staffing channels, the facility may need to consider short term per diem staff to help with screening and post-COVID-19 symptom assessments. The facility health leadership should be trained and supported to track and report on the link between patient care needs and staffing resources so that gaps in access to care from inadequate staffing are transparent. BOP/PHS leadership at Lompoc should also devise a staffing plan and threshold for use of the hospital unit with a predetermined number of active COVID-19 infections.

Recommendation 3. Every person with a recorded positive COVID-19 test should have a health encounter with a mid-level or physician provider within 7-10 days of their release from medical isolation to identify a) their original symptoms, b) the presence of any lingering or ongoing symptoms and c) the need for repeat encounters, specialty referral or physical or occupational therapy. It is important for these encounters to identify whether each patient was ill with COVID-19 symptoms and when they were tested in relation to their symptoms. Because most patients in Lompoc BOP tested positive weeks or months ago, these encounters should start with those who are on the chronic care service. This assessment can easily be added as a template or feature of chronic care encounters.

Recommendation 4. BOP Lompoc should utilize basic quality assurance tools to measure and report in their quality meeting the percentage of sick call requests that are seen in a timely manner, as well as the percentage of chronic care encounters that occur in a timely manner. The quarterly quality meeting displays this approach in some areas but sick call and chronic care encounters are reported only in terms of number of visits without any assessment of what percentage of the total encounters occur in a timely manner.

Recommendation 5. BOP Lompoc should implement measures to promote social distancing,

institutional cleaning/disinfecting and mask wearing including consideration of;

-Use of camp program area for recreation with socially distanced seating.

-Training of officers on how to promote/encourage social distancing.

-Implementing social distancing in medication, food and other lines.

-Regular COVID-19 town halls in each housing area with health and security leadership.

-Use of enhanced cleaning/disinfecting for responding to suspected COVID-19 cases. This should

include specialized training and the same level of PPE for both staff and detainees engaged in this

work.

-Development of monitoring tools for staff mask wearing, implementation of

cleaning/disinfecting and other infection control measures by security staff. These tools should

provide documentation that compliance is assessed and that deficiencies are addressed.

Recommendation 6. Paper towels and soap should be made available to all detained people in any

location where they wash their hands.

Recommendation 7. BOP Lompoc should provide basic services and freedoms to people in

quarantine and medical isolation, including access to phone calls, recreation, reading material and

time out of cell. Medical isolation should also follow CDC guidelines for being non-punitive.[11]

Recommendation 8. BOP Lompoc and BOP generally should investigate the occurrence of

retaliation and threats against detained people who report medical or health related concerns.

Recommendation 9. BOP Lompoc and BOP headquarters should expedite the applications and

reviews of high-risk patients who meet criteria for home confinement and report on the number

and timing of pending and approved applications.

---

[11] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention
Facilities. Updated July 22, 2020. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-
detention/guidance-correctional-detention.html#Medicalisolation, accessed 9/17/20.

Venters-BOP Lompoc

Recommendation 10. I recommend that BOP Lompoc coordinate with PHS and BOP headquarters to undertake a review of all COVID-19 related deaths throughout BOP facilities with specific attention to the following areas;

-Gaps in daily screenings and medical isolation assessments.

-Late or missed chronic care, delays in response to sick call.[12]

-Whether patients who died had been reviewed or expedited for potential release.

-Whether mortality reviews routinely fail to identify findings or recommendations for improvements in care.

The six 'COVID-19 Mortality Review Guidance Questions' that each of the current death reviews mandate do not inquire whether a patient experienced delays or denials of sick call or chronic care and also do not ask whether chronic health problems were well or poorly controlled. There is also no question as to whether the patient received daily screenings while in quarantine or daily clinical assessments while in medical isolation. Without answering these questions for each mortality review, it is unlikely that inadequacies in care will ever be linked to the outcomes of serious illness or death from COVID-19, despite the reality that they are intimately connected.

## F. Summary

39. The COVID-19 outbreak at BOP Lompoc has been one of the prison system's most expansive, in terms of the percentage of detained people who were infected as well as those who died. The response of the BOP and PHS to this unprecedented challenge at Lompoc exhibits both significant strengths and serious deficiencies. Overall, the COVID-19 response at BOP Lompoc is characterized by some evidence-based strategies being superimposed on a grossly inadequate system of health care. As a result, the policies and procedures developed to find and respond to

---

[12] For almost 2 decades, the U.S. Department of Health and Human Services has identified the link between poorly controlled chronic health problems and hospitalizations. See https://www.ahrq.gov/downloads/pub/ahrqqi/pqiguide.pdf, accessed 9/19/20. This lens should be applied to a review of all COVID-19 deaths in BOP custody.

COVID-19 cases, slow the spread of the virus and protect high risk patients have been incompletely implemented. Many of the deficiencies in health access flow directly from chronic, unaddressed understaffing. This problem has been previously identified but I am very concerned by facility leadership's inability to discuss or quantify how these shortages relate to the COVID-19 response.

40. A common thread that I observed throughout my inspection was a lack of data tracking or basic quality assurance in the approach that leadership takes, not only for staffing, but in access to sick call, chronic care and cleaning/disinfecting. The BOP/PHS team offered numerous assurances that these and other critical COVID-19 tasks, such as screening of detained work crews, occur without fail-despite contrary reports by detained people and ample evidence to the contrary in documents I have reviewed, including the records of people who died from COVID-19. Based on my review of the quarterly quality meeting report and other records, I believe that implementing these quality assurance tools is feasible and would be extremely helpful in providing regular, objective data critical to the COVID-19 response.

41. The BOP COVID-19 response at Lompoc can be vastly improved by building on existing strengths and addressing longstanding weaknesses, especial in the health service. By applying the same rigorous approach that is utilized for staff COVID-19 screening to detained people, addressing the punitive nature of quarantine settings and ensuring regular assessments of people in medical isolation, I am confident that cases will be more quickly identified and cared for. Unless the chronic staffing shortages are addressed, however, people with acute complaints relating to COVID-19, influenza and other health problems will likely be missed, and similarly, without adequate staffing for chronic care and post-COVID-19 care, the patients who do become ill with COVID-19 and influenza will face higher risks of serious illness and death. A much more thorough review of deaths from COVID-19 is required by BOP/PHS.

42. Addressing these concerns in the health system will take time, as will the implementation of better social distancing and other infection control efforts. The current census of many housing

Venters-BOP Lompoc

areas, and the considerable number of high-risk people inside Lompoc create a strong mandate

for more vigorous consideration and processing of compassionate release applications.

Executed this 25th day of September, 2020 in Jackson MS

Signed,

Homer Venters MD, MS

Venters-BOP Lompoc

## G. Appendix 1. Materials Reviewed for Venters BOP Lompoc Inspection Report

- Protective Order.
- BOP home confinement memo.
- BOP Lompoc COVID-19 memos.
- BOP COVID-19 Cleaning materials, K unit cleaning detail roster.
- Written inmate communications.
- COVID Case data.
- Camp cleaning logs.
- Chronic care roster.
- Staffing vacancies.
- Medical isolation log.
- COVID-19 Screening logs.
- Grievances.
- Medical records for deceased inmates.
- Medical records of petitioners.
- Mortality reviews (internal and external consultant) for deceased inmates.

31

# Certificate of Service

I, _Raymell Eason_ hereby certify that I have served a true and correct copy of the following by placement in the inmate mail:

_Answer to the Government's supplemental brief_

Service of process is deemed complete at the time of delivery to the United States Postal Service for forwarding to the Court. **Houston v. Lack** 101 L.Ed.2d 245 (1988) confirms that by such service upon the parties to litigation and or his/her attorney of record, by placement in a sealed, postage prepaid envelope addressed to:

_United States District Court_
_Eastern District of California_
_501 I Street_
_Sacramento, CA 95814_

and deposited in the United States Mail maintained by the United States Penitentiary Lompoc; Lompoc, California, all requirements of service of process required by law have been fulfilled this:

_20th_ day of _October_ 20 _21_

United States Penitentiary
3901 Klein Boulevard.
Lompoc, CA 93436-2706

(Name) _Raymell Eason_

_14003-097_
Bureau of Prisons Register
Number